[No. 6377.]

## YOUNG v. THE PEOPLE.

1. **Homicide—Self-Defense—Instructions**—It is fundamental that one who, upon reasonable grounds, believes he is in imminent danger of death, or great bodily harm, may act upon such appearances, and defend himself, even to the taking of life, even though in fact the appearances were false, and he may have been in no real danger. And when one accused of willful murder produces evidence tending to show that the homicide was committed under such appearances, and in the honest belief of his danger, he is entitled, upon application, to an instruction as to the right of self-protection against apparent dangers. To refuse the instruction, when requested, is a determination by the court of matter of fact, and deprives the accused of his constitutional right to a trial by jury.—(355, 356)

2. **Cases Overruled, Distinguished, or Explained**—The doctrine of Mackey v. The People, 2 Colo. 19, that error in the charge will not reverse where it is manifest that the verdict must have been the same if the error had not been committed, has no application where the facts are in dispute and unbiased minds might draw different conclusions.—(364)

3. **Criminal Law—Malice—Intent—Reasonable Doubt**—Upon the trial of an information for homicide, the accused is entitled to an instruction that the intent of the prisoner, and the question of malice, are for the jury, and that the presumption of innocence attends the prisoner throughout the trial and must be overcome by evidence excluding reasonable doubt.—(366)

*Error to Montrose District Court*—Hon. SPRIGG SHACKLEFORD, Judge.

Mr. T. J. BLACK, and Mr. H. M. HOGG, for plaintiff in error.

Hon. WM. H. DICKSON, attorney general, Mr. GEORGE D. TALBOT, assistant attorney general, Hon. JOHN T. BARNETT, attorney general, Mr. JAMES M. BRINSON, deputy attorney general, and Messrs. BELL, CATLIN & BLAKE, for defendant in error.

Mr. JUSTICE BAILEY delivered the opinion of the court:

Under an information charging the crime of murder, for the killing of one Charley Wilkinson, the plaintiff in error, Henry Young, was, on October 28, 1907, in the district court of Montrose county, convicted of second degree murder and sentenced to a term of imprisonment in the state penitentiary for a period of not less than twenty-five years or more than thirty years. He brings the case here for review and assigns numerous grounds for error, only one of which, since that necessitates a reversal of the judgment, will be considered at length. Other supposed errors may not occur at another trial, and the one dealt with, appeals to us as being the serious matter to which our attention is directed.

The defense was self-defense. The plaintiff in error complains of the court's refusal to properly and fully, as is charged, advise the jury respecting the law upon that subject.

The trial court, treating self-defense as being involved in the case, upon request of the district attorney, gave these instructions:

"Justifiable homicide is the killing of a human being in necessary self-defense of habitation, property or person, against one who manifestly intends or endeavors by violence to commit a known felony, such as murder, rape, robbery, burglary, and the like, upon either person or property, or against any person or persons who manifestly intend and endeavor in a violent, riotous or tumultuous manner to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein.

"A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the

(23)

party killing really acted under the influence of those fears, and not in a spirit of revenge.

"The jury are further instructed that the right of self-defense is only given in emergencies to, enable persons who are attacked and to whom it may reasonably appear, that their lives or bodies are in danger of great bodily injury, to defend themselves; that this right is based upon what reasonable persons, having due regard for human life, would do under similar circumstances, and the actions of the defendant in this case must be measured by this rule. The right of self-defense is the right to defend one's self from such an attack, and when the attack is repelled, or warded off, or when the assailant has declined further combat, the person assailed has no right to follow up his adversary and kill him after the attack has ceased, or after such a time as it may have reasonably appeared to the person attacked further danger to life or body has passed.

"The jury are instructed that one who seeks and brings about a difficulty cannot shield himself under the plea of self-defense from the consequences of assaulting his adversary, however imminent the danger he brings upon himself. Self-defense is not available where defendant is not reasonably freed from fault, nor unless there is evidence tending to show that he either was or appeared to be menaced at the time by some overt act on the part of the assailant of a character to create reasonable apprehension of danger of his life or of great bodily harm."

The foregoing comprise the court's entire charge upon the law of self-defense, and this too in the face of objection and exception on the part of defendant to them, and affirmative requests, to be hereafter noticed, for instructions upon that subject, correctly

and amply defining the rights of the defendant there-under.

The first instruction is the statutory definition of justifiable homicide, and the other two are mere negative instructions, given on behalf of the people, specifically pointing out certain conditions, circumstances and situations, under which the defendant may not avail himself of that defense. They do not purport to state the law of this subject *in extenso,* or with any degree of fullness. They were entirely proper for the purpose intended, but under the conflicting testimony, touching the facts immediately surrounding the homicide itself, the defendant had a constitutional right to have a lucid, accurate and comprehensive statement by the court to the jury of the law on the subject of self-defense from his standpoint, upon the supposition that the jury might believe, and accept as true, his testimony, and that of his witnesses, explanatory of the encounter which resulted in the death of Wilkinson.

It is fundamental that the law of self-defense, which is emphatically a law of necessity, involves the question of one's right to act upon appearances, even though such appearances may prove to have been deceptive; also the question of whether the danger is actual or only apparent, and as well the fact that actual danger is not necessary, in order to justify one in acting in self-defense. Apparent necessity, if well grounded and of such a character as to appeal to a reasonable person, under like conditions and circumstances, as being sufficient to require action, justifies the application of the doctrine of self-defense to the same extent as actual or real necessity. The court's instructions upon these vital and essential points of the law of self-defense are strikingly silent. When a person has reasonable grounds for believing, and does in fact actually believe, that danger of his

being killed, or of receiving great bodily harm, is imminent, he may act on such appearances and defend himself, even to the extent of taking human life when necessary, although it may turn out that the appearances were false, or although he may have been mistaken as to the extent of the real or actual danger. It is for the jury to say, under all of the testimony and under proper instructions from the court upon the subject, whether appearances of danger were real or apparently real, so as to justify action in self-defense. A person charged with homicide and defending upon the ground of self-defense is entitled, upon request, to have the jury instructed, when there is conflicting testimony upon the subject, as to the law of self-defense, upon the evidence of apparent danger and apparent necessity to kill, as well as upon real danger and actual necessity, and in every aspect of the testimony.—*May v. The People,* 8 Colo. 210; *Crawford v. The. People,* 12 Colo. 290; *Boykin v. The People,* 22 Colo. 496; Wharton on Homicide (3d ed.), § 221, and authorities there cited.

The proof shows that there had been previous difficulty between the defendant and the deceased. That in January, 1905, the former, according to his testimony and that of the witness Richard Williams, had been shot and wounded from ambush by the latter. Also it discloses repeated threats by the deceased against the defendant, to the effect that the deceased would kill Young on sight, or at first opportunity. One at least of these threats had been communicated to the defendant prior to the killing.

Something of the situation on the day of the homicide, from the defendant's viewpoint, is made to appear by the testimony of certain witnesses hereafter quoted, and also from the brief summary of the defendant's own testimony, set out in the brief of the attorney general, as follows:

"This witness, (the defendant) testifies substantially that the deceased held his gun in his hand and was trying to shoot him from under and over his horse; that deceased was trying to shoot him when he fired the first shot and when he fired the second shot, and that when he fired the third shot he was trying to get behind a raise in the ground like breastworks."

Commenting on this testimony in his brief, and obviously admitting that it at least tended to support a claim of self-defense, the attorney general says:

"Remember, this is an interested witness (the defendant); his life was at stake. He is contradicted absolutely by John Rohwer and by the circumstances, —the gun of deceased being found in his pants, in a scabbard, and bloody. It must be manifest to the court that his testimony cannot be true."

To which suggestion it need only be said that the question of the credibility of the testimony is solely for the jury to determine, under proper instructions. If the court may in a given case say certain testimony is true or false, then the jury is left without a function.

John Nafus, a witness for defendant, testified:

"Remember the shooting of Wilkinson on April 22, 1907; was right there at the time, fifteen paces from where Wilkinson stood when first shot was fired. Wilkinson was standing in front of his horse. Young fired right in under the horse's neck like, Wilkinson was facing Young; at that time he (Wilkinson) had the gun in his hand, right hand; as near as I can say he came around the horse this way and he had it right like this (illustrating) with gun in right hand down beside right leg pointed toward the ground, was exposed in plain sight. Henry Young fired three shots, the second quick as a man could after the first.

"Q. How soon after the second shot was it until he fired the third shot?

"A. Well, there wasn't a great deal of difference, he fired the third shot, oh, I don't know, I believe it was about twenty feet he went and crawled under the fence, and as he went through the fence he fired the shot. As he came through the fence he was down on his feet and hands, and as he straightened up he kind of looked that way (illustrating) and Young fired, he shot to the right. He did not crawl any part of the way.

"Q. Who did you first see on the ground?

"A. There wasn't any difference I could see, they got on the ground as near as I could see about the same time."

Claire Young, a witness for defendant, testified:

"Henry Young, defendant, is my father; am twenty years of age. He (father) came down road and motioned for me to come back, and I came back pretty close to where he was, and I hollered and asked him what he wanted and he said Mr. Skeen told him he had some of his cattle and wanted him to get them, and then rode back to Mr. Skeen. I rode back with father to where Skeen was. After my father had got back he was talking with Skeen about how he was to get the cattle out of the bunch, and Charlie Wilkinson rode up and pulled a revolver and father saw him and dismounted, and they both dismounted, and father says, 'Charlie,' he says, 'throw down that gun,' he says 'you son of a bitch, you ambushed me once, and you better throw your gun down,' and Charlie put his gun over his horse's shoulder, looked like to pull his gun, he looked over his horse two or three times and also under, then he also would try to get the opportunity under his horse to shoot, and father would keep walking around and commanding him to drop his gun, and he walked around until he

got a view of Charlie and asked him a time or two to drop his gun and Charlie would keep around the horse like to keep from being in father's view and he got around likely behind the horse's shoulder like and father asked him to drop his gun and he didn't and father shot him. Father fired three shots, the second rapidly after the first, the third shot after Charlie had got through the wire fence. Charlie run from where he stood after the second shot was fired to the fence, his face was toward my father looking over his shoulder just as he raised up off his hands and knees when the third shot was fired. Charlie's gun was in his hand when father fired the first shot, in his hand when father fired the second shot, at the time father fired the third shot I couldn't see the gun he (Wilkinson) was in a swag from me and I could just see his head and shoulders like.''

On cross-examination this witness further testified as follows:

''Q. How was Wilkinson holding his gun when the first shot was fired?

''A. Something like this, (illustrating) he raised his gun before my father fired, he tried to shoot over the horse, first he looked over his horse, then under his horse two or three times. After father got in open view of him he held his gun down this way, (illustrating) holding gun at right side, pointing to ground, and he was holding gun that way when first shot was fired. He (Wilkinson) didn't seem very excited when he first pulled his revolver.

''Q. And did you see any danger in Charlie Wilkinson, the appearance of danger after he got through the fence and was going away?

''A. Yes, sir; it looked as though he was trying to get behind a post or bunch of rocks.''

On this state of facts the defendant asked a number of instructions covering the law of self-de-

fense, all of which were refused by the court. Instructions numbered 1 and 5, respectively, on this subject, so requested, and by the court refused, are as follows:

"No. 1. The court instructs the jury that a defendant may be justified in taking human life if it appeared to him at the time, and would have so appeared to a reasonably prudent person in the same circumstances, that his life was in imminent danger, or that he was in imminent danger of receiving great bodily harm, although he was not in fact in danger; and in this case, if the jury believe from the evidence that the defendant Henry Young was not the aggressor, and that shortly before the fatal shot or shots were fired it appeared to the defendant Henry Young, and would have so appeared to a reasonably prudent person in the same circumstances, that it was necessary to save his own life, or to prevent his receiving great bodily harm, to fire the fatal shot or shots, and that acting solely upon such belief the defendant Henry Young fired the fatal shot or shots, then the defendant Henry Young should be acquitted, even though the jury may believe from the evidence that he was not in fact in danger."

"No. 5. If, from the evidence in this case, you believe that the defendant, Henry Young, did shoot and kill the deceased, but further believe from the evidence that, at the time of such killing, the deceased had made an attack upon the defendant Henry Young, of such a character as to put the defendant Henry Young, in imminent danger of death, or great bodily harm, or that deceased was about to make an attack, and that the circumstances caused the defendant, Henry Young, to have a reasonable fear of death or great bodily harm, and that, acting under such reasonable fear alone, the defendant Henry

Young, killed the deceased, you should find the defendant Henry Young, not guilty."

While we do not say that these particular instructions should necessarily have been adopted, what we do say is, that under the facts it is clear that proper instructions. either like those requested or their equivalent, covering the defendant's right to act upon appearances, that actual danger is not indispensable to warrant one acting in self-defense, and that the defendant, acting as a reasonable person, had a right to judge for himself of the danger, should have been given. A single instruction covering this entire phase of the case could easily have been framed by the court for the jury.

So long as the constitution and laws of the state provide for the trial of persons charged with criminal offenses by a jury, no court, either at *nisi prius* or upon review, has a right to substitute itself as a trier of facts, and thus invade the province of the jury and pass upon the credibility of the witnesses and the weight of the testimony. These are always questions exclusively for the jury. No matter how lightly the court may regard the testimony offered in behalf of the defense, and no matter how unreasonable, improbable or even unbelievable it may seem to be, still the question of the weight of the testimony, and the credibility of the witnesses is to be determined by the jury, properly advised as to the law. Unless this be done a defendant is deprived of his constitutional right to such trial. It is manifest that there was testimony in the case tending, at least, to establish the defense of self-defense, and the whole question should have been submitted to the jury, under proper instructions, for its finding upon the facts. We are the farthest possible from intimating an opinion that the testimony of the defense in this connection was true, or that a case of self-defense was in

fact made out.  We simply say, inasmuch as there was a direct conflict in the testimony, between the witnesses of the state, and of the defendant, as to exactly what did occur at the time the fatal shot or shots were fired, and since there was testimony tending to establish self-defense, the whole matter, including the question of which was the fatal shot or shots, should have gone to the jury, under explicit and full instructions, on the subject of that defense.  The court, by its failure to so instruct, practically withdrew the question from the jury as to whether the defense had been made out.  This is no mere technical error, it is one of vital substance.  It involves the solemn question of one's right to a trial according to the well known and settled legal principles.  The lawful and constitutional rights, not merely of this defendant, but of every citizen of the state, are here involved, and the doctrine we announce is not of particular, but of universal application.

This court, in *Boykin v. The People, supra*, speaking through Mr. Justice Campbell, and upon a question similar to that here involved, said:

"The court has properly instructed the jury upon the law of self-defense upon the supposition that the testimony of the witnesses for the people was true, but it was its duty to instruct upon the opposing theory that the killing was done in necessary self-defense.  *  *  *  But where a defendant is where he has a right to be, as, for example, a police officer engaged in making an arrest, and is assaulted by the deceased in a way that the defendant honestly and in good faith believes, and the circumstances being such as would induce a like belief in a reasonable man, that he is about to receive at the hands of his assailant great bodily harm, or to lose his life, the defendant, if he did not provoke the assault, or is not within some of the exceptions above noted, is not

obliged to retreat or flee to save his life, but may stand his ground, and even, in some circumstances, pursue his assailant until the latter has been disarmed or disabled from carrying into effect his unlawful purpose; and this right of the defendant goes even to the extent, if necessary, of taking human life.  *  *  *

"In the light of the evidence it is a matter of regret that this case must be sent back for a new trial. However improbable the story of the defendant that, to save his own life, he was compelled to take the life of Smith, when he, and a fellow policeman, were engaged in clubbing deceased, with four other policemen visible and within easy call just across the street, still the defendant had the right to the judgment of the jury upon it, aided by instructions of the court correctly stating the law of self-defense in any and every aspect of the evidence."

And again this court, in *Crawford v. The People, supra,* speaking through Chief Justice Helm, said:

"When there is any evidence whatever tending to establish a certain statutory grade of criminal homicide, and the court refuses to charge the jury with reference thereto, error is committed; but if there be a total absence of evidence relating to the particular grade disregarded, the charge cannot be successfully challenged on the ground of such omission.  *  *  *  In cases where death ensues from poison, or where the defendant lies in wait for his victim, or where the deceased is a helpless infant, and the like, there may sometimes be but little hazard in declining to instruct upon the grades of man-, slaughter. But where there is an affray, and where self-defense is relied on, the court exercises an exceedingly dangerous prerogative in refusing to charge upon the minor as well as the graver offenses covered by the indictment. He should be absolutely

certain that there is an entire absence of evidence bearing upon the particular grade or grades omitted.

"The refusal of the court below to instruct in this case upon the subject of voluntary manslaughter was error. By the statute the accused in criminal cases is permitted to become a witness, and when once upon the stand all the ordinary rules of evidence apply to him. He is subject to cross-examination, his testimony may be impeached, the circumstances under which he testifies may be considered, and perjury on his part can be as readily disclosed as in the case of other witnesses. The jury are to give his testimony such credit and such weight as in their judgment shall, under all the circumstances, be proper. They may accept it as true or they may reject it as false. But however incredible or unreasonable such testimony shall seem, the accused is entitled to an instruction upon the hypothesis that it may be true."

Counsel for the state vigorously appeal for the application of the principle of law laid down in the case of *Mackey v. The People,* 2 Colo. 19, to the effect that no matter if wrong instructions were given or right ones refused, or improper testimony admitted, still, if upon a review by the appellate court of the entire record, it is manifest that justice has been done, and that the verdict must have been the same under correct instructions and the admission of proper testimony, the court should not interfere.

This doctrine has application to cases where the facts are undisputed, and upon which facts, thus uncontradicted, but one result could possibly be reached. It has no reference to cases where the facts are in dispute, and concerning the effect of which men might honestly differ. It does not contemplate the substitution of the judge's estimate and judgment, upon the weight of contradictory testimony, for that

of the jury. To so hold would be to ingraft upon the jurisprudence of this state a new and heretofore unheard-of doctrine, revolutionary in results and subversive of constitutional rights. Here is what the learned judge said in that case:

"It is conceded that it rests upon the People to show that the prisoner was not and could not have been prejudiced by the error in this instruction. When this is made to appear the law is well settled in criminal as well as civil cases, that error in the charge is not a ground for a new trial. * * * Upon the undisputed facts established by the evidence, the prisoner is guilty of the crime of which he has been convicted, and, as there was no room for doubt, the jury must have arrived at the same result under a proper charge."

The conclusion there, as will be seen from the above, was based solely upon the proposition that the facts in the case were undisputed, and that, since the testimony was not conflicting, there was no room for doubt as to the guilt of the prisoner; hence whatever the instructions, right or wrong, the result from the admitted facts must have been the same. It needs no argument to show that this doctrine, under the state of facts shown to have there existed, has no application to the case at bar.

We by no means intend to imply a belief that, had the jury been properly instructed, the verdict would have been different. All we do say is that the defendant did not get the instructions on this subject to which, as matter of law, he was clearly entitled. It is too obvious to require comment that it is impossible for this court to determine and declare that such error was without prejudice. We reach this conclusion with the utmost reluctance, in view of all of the testimony, but as already indicated, the principle

.involved is of too wide import to be narrowly limited, because of the peculiar facts of this particular case.

It is proper to suggest that, upon another trial, the instructions asked by defendant with reference to malice and intent being questions of fact for the jury to pass upon, under all of the testimony, and that the presumption of defendant's innocence pre- vails throughout the trial, and until his guilt is estab- lished, by the testimony, beyond a reasonable doubt, should be given in substance.

The judgment is reversed and the cause re- manded to the court below for a new trial, in con- formity with the views herein expressed.

*Reversed and remanded.*

Decision *en banc.*

Mr. JUSTICE HILL not participating.

CHIEF JUSTICE STEELE dissents.