The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Charles COLLINS, Defendant-Appellant.

Nos. 84SA240, 85SA318.

Supreme Court of Colorado,
En Banc.

Dec. 8, 1986.
Rehearing Denied Jan. 20, 1987.

Milton K. Blakey, Dist. Atty., F. Joseph Fennessy, Jr., Kenneth H. Jaynes, Deputy Dist. Attys., Rifle, for the People in No. 84SA240.

David F. Vela, Public Defender, Peggy O'Leary, Deputy Public Defender, Denver, for Collins.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for the People in No. 85SA318.

VOLLACK, Justice.

In this consolidated appeal, the defendant, Charles Collins, seeks reversal of his conviction by jury trial of first degree assault under section 18–3–202, 8B C.R.S. (1986), and of crime of violence under section 16–11–309, 8A C.R.S. (1986), and of his sentence in the aggravated range for the crime of violence conviction. The People also appeal. They claim the trial court improperly considered certain jury affidavits in the defendant's motion for new trial, notwithstanding the trial court's denial of the motion. We dismiss the People's appeal and affirm the judgment and sentence.

I.

The facts which led to the filing of charges against the defendant are in dis-

pute. According to the defendant, he was parked off the side of a road west of Rangely, Colorado, drinking beer with two friends, Bill Humes and Laurie Conn, on the afternoon of July 15, 1983. The defendant consumed five or six beers. While driving toward town, he saw a truck approaching. The truck was driven by James Darrell King. The defendant testified that King ran him off the road and then backed up into the side of his car. King exited his truck and began to speak in an aggressive manner. When King threatened Humes, the defendant testified that he reached into the car for a .22 rifle. King lunged at the defendant and grabbed the weapon. The two men began to struggle, and the defendant testified that King bit the defendant's thumb and grabbed the muzzle of the rifle. The defendant testified that he was afraid King was going to gain possession of the rifle and that he, therefore, pulled the trigger two or three times.

King testified that it was the defendant who was in the middle of the narrow road and who forced him off the side of the road. King alleged that the defendant shouted at him as he passed. King returned to the road, but noticed that the defendant had pulled over. King testified that he backed down the road, stopped his truck, and exited. At the same time, King alleged that the defendant left his car carrying a rifle and that he pointed it at King. King testified that the defendant told him to get down on his knees, that he said no, and that the defendant shot him in the chest. King alleges that after he was shot, he attempted to wrestle for the rifle, but soon became incapacitated because his lung had collapsed.

All witnesses agree that after the victim was shot, the defendant handcuffed him, grabbed him by the hair, and hit him several times. The defendant also hit King with the butt of the rifle. The defendant ordered Humes to roll the victim over and point his head downhill because "they bleed better that way." King testified that he kept trying to rise, but each time the defendant would strike him back down. King told the defendant he would die if he did not get to a hospital, and the defendant responded, "Damn right you're going to die, you deserve to die." The evidence is conflicting as to whether the defendant then shot King twice more, once in the eye and once on top of the head, or whether the two wounds were caused by a blunt object.

Humes and Conn started to run to the defendant's nearby home to notify the defendant's mother and the police. On the way Conn flagged down her boyfriend, Tony Wiser, and another friend, Darren Todd, who were driving in a truck and returned to the scene of the shooting.

When they arrived, the defendant was standing near his car, holding the rifle. Todd offered the defendant a beer. They discussed taking the victim to the hospital, but the defendant told Wiser not to do anything, just to leave the victim there and let him die, because the world did not need his kind. Wiser ignored the defendant and drove King to the local hospital. King survived his injuries.

At the hospital where King was taken, blood samples were drawn for purposes of treatment. The police obtained one of the vials and transported it to the local C.B.I. office for a blood-alcohol test, but that office did not have the equipment to perform the test. The vial was then taken to the Meeker County Sheriff's office and stored in a refrigerator. On July 20, 1983, the defendant filed a motion for preservation of evidence, requesting an order directing the prosecution to preserve the blood sample. The motion was granted on July 22, 1983. In October of 1983, however, when a sheriff's officer opened the refrigerator door, the blood sample fell and broke on the floor. The sample that was preserved was too small to be tested.

On October 13, 1983, the defendant moved to dismiss the charges against him based on the prosecution's destruction of material evidence that might have been favorable to his defense. The district court acknowledged a due process violation, but refused to grant a dismissal of the charges, ruling that dismissal was too harsh a reme-

dy. Instead, the court fashioned the following remedy:

> [t]he appropriate remedy is to allow the defendant to present evidence of the taking of the sample of the victim's blood, evidence of its mishandling and essential destruction by the people, and the evidence in the form of the testimony of Dr. Lantz [serology and firearms expert] as to what could or could not have been determined from that evidence had he had the opportunity to analyze it.

Further, the court concludes that it is appropriate for the court to reverse its prior ruling on the defendant's motion in limine concerning the U.S. District Court prosecution of the victim in a prior incident to assist the defendant presenting his issue of self-defense to the jury.

During jury voir dire, the court limited defense counsel's inquiry into each juror's view of self-defense to one example of a self-defense concept, such as retreat to the wall, in order to probe the juror's reaction to determine whether any of them would reject a concept of law which was unfamiliar to them. If any juror gave an unexpected answer, the court would "rethink" its limitation on voir dire. The court stated that its reason for the limitation was to prevent counsel from lecturing to the jury on the law and trying the case on voir dire.

At trial, testimony was presented that the victim had been drinking on the afternoon of the incident, that he was noticeably intoxicated and that he was abusive. In addition, numerous witnesses, including the victim's aunt, testified as to the victim's tendency toward aggressive and violent behavior and that the victim was often intoxicated.

The prosecution called Humes to testify on the People's behalf. In return for his testimony, the prosecution agreed to a plea bargain on the original felony charges of accessory to first degree assault and crime of violence. Humes was to receive a deferred sentence and two years of probation. The prosecution introduced evidence of the plea bargain through direct examination of Humes. On cross-examination, the following question was asked of witness Humes:

> Q Mr. Humes, just to clear up one matter raised on direct examination.
>
> As a result of the plea bargain that you entered into, the maximum amount of prison liability that you had—

At that point, the prosecution's objection on grounds of irrelevance was sustained.

When the jury returned the verdicts, there was a request to poll the jury. The court polled the jury, and, so far as the record shows, there was unanimous concurrence in the verdicts at that time.

Subsequent to the jury's verdict and the entry of the court's judgment, the defendant made a motion for new trial, alleging that the jury's verdict was the result of misconduct and was invalid. At the motions hearing on April 12, 1984, the court considered the affidavits of jurors. The court refused to allow the defendant to present testimony from jurors that the jury failed to find beyond a reasonable doubt that serious bodily injury was inflicted on the victim. However, on its own motion, the court raised the matter of coercion exerted against one juror. After receiving testimony from that juror, the court denied the motion for new trial.

The court then received testimony and argument concerning the sentencing of the defendant and, pursuant to section 18–1–105(1)(a), 8B C.R.S. (1986), sentenced him to the Department of Corrections for eight years and one day.

The defendant raises numerous issues on appeal. We address each issue separately and affirm the judgment and sentence.

## II.

The defendant contends that the prosecution's negligent destruction of the victim's blood sample was a due process violation which could only be remedied by dismissal of the case. The defendant argues that an analysis of the blood would have allowed him to determine the amount of alcohol it contained and assisted in his self-defense argument. The district court ruled that

the negligent destruction of the blood sample was a due process violation. However, it fashioned a less drastic remedy than dismissal of the case by allowing the defendant to present evidence of the taking of the sample of the victim's blood, evidence of its mishandling and essential destruction by the People, and evidence in the form of testimony of Dr. Lantz as to what could or could not have been determined from the evidence had he had the opportunity to analyze it. In addition, the court reversed its prior ruling on the defendant's motion in limine concerning the use of a United States District Court prosecution of the victim in a prior incident to assist the defendant presenting his issue of self-defense to the jury. The prosecution concedes that the negligent destruction of the blood sample was a due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *accord, e.g., United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *People v. Sheppard*, 701 P.2d 49 (Colo.1985); *People ex rel. Gallagher v. District Court*, 656 P.2d 1287 (Colo.1983). Therefore, we restrict our analysis to the question of whether the court fashioned a proper remedy.

■■■ The character of the evidence destroyed, not the degree of the prosecution's culpability, determines whether there has been a constitutional violation. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *People v. Sheppard*, 701 P.2d 49 (Colo.1985). However, the conduct of the prosecution may be taken into account in fashioning a remedy for the governmental destruction of evidence. *Sheppard; People ex rel. Gallagher v. District Court*, 656 P.2d 1287, 1293 (Colo. 1983). The paramount concerns in selecting a remedy are the preservation of the integrity of the truth-finding process and the deterrence of the destruction of material evidence by the police or prosecutor. *Sheppard; People v. Sams*, 685 P.2d 157 (Colo.1984). While dismissal of charges is an appropriate sanction when no other remedy would produce a fair result, a less

drastic solution often can be adopted. *Sheppard*, 701 P.2d at 55; *Sams*, 685 P.2d at 163.

■■ Here, there was no egregious misconduct by the government. The conduct resulting in the loss of the evidence was inadvertent rather than intentional. In *Sheppard*, we noted,

> While trial courts retain discretion in fashioning an appropriate remedy for an accused prejudiced by governmental loss or destruction of exculpatory and material evidence, the sanction imposed, at least in the absence of egregious governmental misconduct, should be no more restrictive than is necessary to protect the defendant's constitutional rights.

701 P.2d at 55 (citing *Sams*, 685 P.2d at 162–63 (citations and footnote omitted)).

Whether the preservation of the integrity of the truth-finding process may be satisfied by a less drastic solution than dismissal of the charges turns on whether "the evidence destroyed was crucial to [Collins'] defense and cannot adequately be reproduced through *any* other means." *Sheppard*, 701 P.2d at 55 (emphasis added). While the destruction of the victim's blood sample was important to Collins' defense, we believe that an adequate alternative to that evidence was established by other means.

The defendant wanted to introduce the blood sample test results as evidence of the victim's intoxication and propensity for violence. Other evidence satisfied this purpose. King testified that before the assault, he had "a couple of beers" at a bar. Greg Love, who knew King for two and a half years and who had witnessed King in the bar on the afternoon of the incident, testified that in his opinion, "King was under the influence of alcohol [that afternoon]. He was slouched over the bar." As King left the bar, he referred to Love as a "shitbird." Conn testified that during the incident, King slurred his words and was noticeably intoxicated. As part of the sanction against the People for the loss of the blood evidence, the court allowed the de-

fense to present evidence of Officer Sid Ackler who testified about an arrest he made of King approximately one year prior to the present incident. Ackler testified that King, who appeared intoxicated at the time, first attempted to elude the officer, then, once stopped, acted in an extremely aggressive and violent manner toward the officer. King had to be restrained by the use of mace, a night stick, and handcuffs. In addition, the court allowed testimony from George Lee (who knew King well since 1964), Judy Fischer, Frances Sears (King's aunt), Lorraine Porter (who knew King for twenty-five years), Louise Lewis (who knew King all of his life), and Cecil Powell (who knew King for thirty years). All testified that King had a bad reputation for violence and aggression. All testified, including the victim's aunt, that in their personal opinions, King is violent and aggressive. Further, the court allowed the defendant the opportunity to present testimony from Dr. Lantz as to what could or could not have been determined from the blood sample that had been destroyed had he had the opportunity to analyze it.

The remedy fashioned by the trial court, within its discretion, was appropriate. The defendant was allowed to present evidence concerning what the loss of the blood sample might have proved and was allowed to present testimony which had previously been excluded. Evidence of intoxication and aggression on the day of the incident, as well as throughout the victim's past, make a remedy of dismissal too drastic and not necessary.

### III.

■ The defendant next alleges that the trial court erred because it improperly limited cross-examination into the bias and motive of a prosecution witness. The right to confront and cross-examine witnesses is guaranteed by the sixth amendment of the United States Constitution and by art. II, sec. 16, of the Colorado Constitution. The right is tempered, however, by the trial court's authority to prohibit cross-examination on matters wholly irrelevant and immaterial to issues at trial. *People v. Loscutoff*, 661 P.2d 274 (Colo.1983); *see People v. Raffaelli*, 647 P.2d 230 (Colo.1982).

■ Bill Humes testified on behalf of the People. In return for his testimony he was allowed to plead guilty to the charge of accessory to a crime of violence and received a deferred sentence and two years' probation, having been originally charged with first degree assault, along with the accessory to a crime of violence charge. The prosecution introduced evidence of this plea bargain through direct examination of Humes.

On cross-examination the defense counsel asked:

Q Mr. Humes, just to clear up one matter raised on direct examination.

As a result of the plea bargain that you entered into, the maximum amount of prison liability that you had—

The prosecutor objected on the grounds of relevancy, and the objection was sustained. The trial court directed the defense to make its argument in-chambers at a later time. When the court next met in chambers, the defendant did not raise the issue.

In *Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), the Court declared:

[D]efense counsel should have been permitted to expose to the jury the *facts* from which jurors, as the sole trier of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right to effective cross-examination which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it."

(Emphasis added.)

Consistent with *Davis*, in *People v. Loscutoff*, 661 P.2d 274, 277 (Colo.1983), we held that, where the jury is fully informed that the district attorney could, but was not planning to, prosecute one witness for allegedly giving a controlled substance to the victim and several others on the evening of the crime, it was not error for the court to

exclude inquiry into potential penalties as being irrelevant. Here, the jury was fully informed that Humes had been charged with first degree assault and accessory to a violent crime, and, in exchange for his testimony, was allowed to plead guilty to the accessory charge, receiving two years probation and a deferred sentence. The jury had the facts from which it could appropriately draw inferences relating to Humes' reliability. The defendant was not denied the right to effective cross-examination.

## IV.

■ The defendant contends he was illegally sentenced in the aggravated range for a crime of violence based on the use of a deadly weapon, because one of the elements of the underlying offense of first degree assault was the use of a deadly weapon. The defendant asserts that such a sentence violates his equal protection guarantees. We disagree.

In *People v. Haymaker,* 716 P.2d 110 (Colo.1986), we held that the fact that the use of a deadly weapon raised first degree sexual assault from a class three felony to a class two felony and also provided the basis for an increased sentence under the crime of violence statute did not, in itself, work a denial of equal protection of the laws or violate constitutional guarantees against double jeopardy. *Id.* at 114–19. We have applied our holding in *Haymaker* to dispose of similar challenges in *People v. Mozee,* 723 P.2d 117, 126–29 (Colo.1986); *People v. Vigil,* 718 P.2d 496, 506 (Colo. 1986); *People v. Sanders,* 717 P.2d 948 (Colo.1986) (per curiam); *People v. Powell,* 716 P.2d 1096, 1104–05 (Colo.1986).

Although our holding in *Haymaker* concerned only first degree sexual assault, it has obvious implications for a similar challenge under the first degree assault statute. In *Mozee,* we noted that, "[t]he legislature rationally could perceive that the mere use of a weapon in some manner during the commission of a specific offense justifies an increased penalty. The crime of violence statute accomplishes that result." *Id.* at 128. We conclude that Col-

lins' sentencing in the aggravated range for a crime of violence based on the use of a deadly weapon during the commission of first degree assault does not violate the guarantee of equal protection of the laws.

## V.

The defendant claims the trial court erred in restricting his voir dire to only one aspect of self-defense. We disagree.

■ It is fundamental to the right to a fair trial that a defendant be provided with an impartial jury. *People v. Gurule,* 628 P.2d 99 (Colo.1981); *Nailor v. People,* 200 Colo. 30, 612 P.2d 79 (1980). The purpose of voir dire examination is to enable counsel to determine whether any prospective jurors are possessed of beliefs which would cause them to be biased in such a manner as to prevent the counsel's client from obtaining a fair and impartial trial. *People v. Mackey,* 185 Colo. 24, 521 P.2d 910 (1974); *People v. Heller,* 698 P.2d 1357 (Colo.App. 1984). Such examination is not without its limitations, however. The propriety of questions to potential jurors on voir dire is within the discretion of the trial court, and its ruling thereon will not be disturbed on appeal unless an abuse of that discretion is shown. *People v. Buckner,* 180 Colo. 65, 504 P.2d 669 (1972); *People v. Saiz,* 660 P.2d 2 (Colo.App.1982).

During the voir dire, the defense counsel asked one potential juror:

Did you think sir, that someone who is attacked by someone else ought to retreat until there is no place else to go before he defends himself?

The trial court called the attorneys into chambers and told the defense counsel not to inquire into the nuances of self-defense. After some argument, the court decided that to allow the defendant to inquire into every aspect of self-defense would constitute lecturing. However, counsel could use one example of a self-defense concept, such as retreat to the wall, in order to probe the juror's reaction and determine whether any of them would reject a concept of law which was unfamiliar to them. Then, if

any juror gave an unexpected answer, the court would "rethink the issue."

■ We have held that it is not an abuse of discretion for the trial court to limit questions on voir dire relating to the law. *People v. Horrocks,* 190 Colo. 501, 549 P.2d 400 (Colo.1976). The knowledge or ignorance of prospective jurors concerning questions of law is generally not a proper subject of inquiry for voir dire since it is presumed that the jurors will be adequately informed as to the applicable law by the instructions of the court. *People v. Swain,* 43 Colo.App. 343, 607 P.2d 396 (1979); *People v. Strock,* 42 Colo.App. 404, 600 P.2d 91 (1979), *rev'd on other grounds,* 623 P.2d 42 (Colo.1981).

■ The court allowed the defendant to question prospective jurors as to one area of self-defense. It specifically told defense counsel that if any juror said anything "unexpected" concerning the defense, the court would "rethink" how to handle the situation. The record does not indicate that any juror did not understand the basic concepts of self-defense, or that any juror would refuse to follow instructions or, later, that any juror did refuse to follow the instructions on the law of self-defense. The trial court did not abuse its discretion in limiting the defendant on voir dire to only one aspect of self-defense.

## VI.

■ The defendant next contends that the trial court's failure to require the prosecution to specify the acts which were the basis for the separate counts of attempted second degree murder and first degree assault left the jury with no guidance for its deliberations and resulted in a clearly erroneous verdict. We disagree.

In *People v. Estorga,* 200 Colo. 78, 612 P.2d 520 (1980), we held that where there is evidence of many acts, any one of which would constitute the offense charged, the People may be compelled to select the transaction on which they rely for a conviction. The rationale for such an election is to enable the defendant to prepare and make his defense to a specific charge, and

to assure that some jurors do not convict on one offense and others on a separate offense. *Id.* at 81, 612 P.2d at 523 (adopting *Burlison v. State,* 501 S.W.2d 801 (Tenn.1973)). Unlike *Estorga,* where evidence was presented that the defendant engaged in various sexual acts with a child, here, evidence was presented regarding a single transaction. The defendant's reliance on *Estorga* is misplaced, and we hold that the court did not need to require the prosecution to elect between the charged crimes when only one transaction occurred.

## VII.

The defendant contends that the jury's verdict was the result of misconduct and was invalid. We disagree.

■ In denying the motion for new trial, the trial court considered affidavits from several jurors. Generally, a verdict in a criminal case may not be impeached by affidavits of jurors. *Yeager v. People,* 170 Colo. 405, 462 P.2d 487 (1969); *People v. Rodriquez,* 638 P.2d 802 (Colo.App.1981). However, a juror's affidavit may be used to impeach a verdict if there has been external influences on the jury, *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), or if there has been jury misconduct. *Alvarez v. People,* 653 P.2d 1127 (Colo.1982); *Santilli v. Pueblo,* 184 Colo. 432, 521 P.2d 170 (1974).

Here, the defendant asserts that there were two types of misconduct. First, the defendant claims that at least five of the jurors failed to follow the court's instructions that the verdict be unanimous, and that all of them failed to make a finding of serious bodily injury to support their verdict of guilty of assault. Second, the defendant claims that the affidavit of one juror showed that coercive tactics were employed against her to force her to give a verdict against her will.

■ We hold that where, as here, the trial court polls the jury upon the return of the verdicts and there is unanimous concurrence by the jurors in the verdicts,

the trial court should not thereafter, on a motion for new trial, consider affidavits pertaining to the unanimity of the verdict and to the jury's findings supporting its verdict, when the affidavits concern the mental process of individual jurors during the course of deliberation. Such affidavits are inadmissible under C.R.E. 606(b). A juror may not testify as to the wrong exercise of his judgment or his confusion on the law or the facts or his misunderstandings. *Martinez v. Ashton,* 124 Colo. 23, 233 P.2d 871 (1951); *People v. Graham,* 678 P.2d 1043 (Colo.App.1983). The affidavits alleged that the jury misunderstood or failed to follow instructions and that it applied the wrong legal standard. Therefore, it was improper for the trial court to have considered this first set of affidavits. The error was harmless, however, because the trial court refused to hear testimony pertaining to these affidavits, and because it denied the defendant's motion for new trial as to the defendant's first contention.

As to the second contention, pertaining to alleged coercive tactics employed against a juror, the trial court properly considered the affidavit and heard testimony from the female juror who asserted the misconduct. The affidavit reveals that the alleged misconduct was "due to one juror threatening to change his vote from not guilty of 2nd degree Attempted Murder to guilty. After nearly four hours of deliberation, I felt it would be useless to argue the point." Because of the word, "threatening," the court raised the issue of threats and coercion on its own motion. It heard testimony from the female juror that the male juror, who was the source of the alleged threats, merely stated that he would change his vote without making any threats of bodily harm and that the verdict of guilty was the complaining female juror's verdict at the time the verdict was returned and the jury polled. The trial court concluded that the complaining juror's verdict was not the result of coercion. Because the affidavit alluded to possible coercion, it was not improper for the court to have raised the issue on its own motion, and, after hearing testimony from that ju-

ror, the court was proper in concluding that the verdict was not the result of coercion.

## VIII.

The defendant next contends that the prosecutor's reference to a statement that had been suppressed was prejudicial to such an extent as to require a mistrial. We disagree.

At a hearing on the voluntariness of statements that the defendant had made, the prosecutor listed for the court all of the remarks which were made by the defendant to Humes, Conn, and the victim during and immediately after the assault, and to the two boys who took the victim to the hospital. When the victim was lying bleeding on the ground, the defendant told him that he deserved to die. He told Humes to turn the victim's body so that he faced downhill because "they bleed better that way." He stated to Humes that "[d]ead men don't talk." He told the victim that whether or not the victim went to the hospital was up to the defendant. When the two boys who took the victim to the hospital arrived, the defendant stated that they should just let the victim die; they did not need people like him in their town. The court determined that all of these statements were voluntary.

However, because the court found that the defense was discovering for the first time that the defendant stated, "[d]ead men don't talk" during the assault, not later in jail, it determined that fundamental fairness required that the statement not be admissible.

While the prosecutor was examining Humes, the following exchange occurred:

Q [by the prosecutor] Did you hear any other statements by Mr. Collins there at the scene of the—

MR. ROOT [defense counsel]: If we may approach the bench for a moment.

THE COURT: Uh-huh.

(side bar bench conference off the record)

Q (by Mr. Jaynes) [the prosecutor] Mr. Humes, let me direct your attention to—tell me if they occurred or not.

Do you remember a statement made by Mr. Collins about dead men—

MR. ROOT: I object here.

THE COURT: Overruled.

MR. ROOT: I think we need to approach the bench again.

THE COURT: Yes.

(side bar bench conference off the record)

The trial court determined that, although error, the partial question did not require a mistrial.

■ The trial court has broad discretion to grant or deny a mistrial, and its decision will not be disturbed on appeal absent gross abuse of discretion and prejudice to the defendant. *People v. Abbott,* 690 P.2d 1263 (Colo.1984); *People v. Hodges,* 624 P.2d 1308 (Colo.1981). A mistrial is the most drastic of remedies. *People v. Anderson,* 184 Colo. 32, 518 P.2d 828 (1974). It is only warranted where the prejudice to the accused is too substantial to be remedied by other means. *Abbott; People v. Smith,* 620 P.2d 232 (Colo.1980).

■ The prosecution contends that since the reference to "dead men" was plural, it did not appear to refer to the victim, nor did the partial question infer any particular state of mind to the defendant. The prosecution further contends that the statement was merely cumulative to the others admitted, which clearly indicated the defendant's intent that the victim die from his wounds. In addition, the prosecution notes that there was no transcript of the first side bar conference immediately before the question and that because the court *overruled* the objection, it would appear that the court initially allowed questioning as to the statement pertaining to dead men.

We find the prosecution's contentions persuasive and cannot conclude that the trial court abused its discretion in determining that the reference was erroneous, but not serious enough to warrant a mistrial.

## IX.

The defendant contends that the trial court failed to properly instruct the jury and that such a failure was reversible error. We disagree.

■ First, the defendant claims that the court should have given defendant's tendered Instruction No. 27, which read:

You are instructed that it is lawful for a person to carry an unconcealed weapon in a private automobile for lawful protection, protection of another person, his property or for sport while traveling.

The defendant requested the instruction so that the jury would not consider that the rifle in the defendant's car was indicative of criminal activity or guilt. The jury had no reason to believe that mere possession of an unconcealed rifle in a car was unlawful. The record does not reveal that any such implication was ever made. We hold it was not error for the trial court to refuse to give the tendered instruction.

■ The defendant also contends that it was error for the court to have refused to give tendered Instruction No. 28, which read:

The defendant may use self-defense when he merely injects himself into a crowd or mild situation which begins only with an argument and develops to a point where he is subjected to or threatened with physical violence from the other person.

This instruction was not supported by the evidence. According to the defendant's statement of the facts, King deliberately backed into the defendant's car and immediately began acting in a violent and aggressive manner. According to King's statement of the facts, after King had been run off the road, he backed down the hill, did not hit the defendant's vehicle, exited his truck, and was immediately confronted by the defendant carrying a gun and issuing orders. In neither version did the defendant inject himself into a "crowd or mild

situation," beginning only with an argument.

In lieu of the defendant's tendered Instruction No. 28, the court gave five other instructions which fully apprised the jury of the law of self-defense.[1] We hold that it was not error for the court to deny this instruction.

■ The defendant also claims that it was plain error for the trial court to fail to instruct the jury that the statutory heat of passion defense applied to first degree assault as well as second degree assault. Defense counsel offered Instruction No. 18, instructing the jury that if it found the defendant guilty of second degree assault, it must then decide whether there was provocation. The prosecution did not object to the instruction, but did object to limiting provocation to second degree assault. The People argued that a provocation instruction should also be given to first degree assault. They tendered an instruction on first degree assault and provocation, but the defendant objected to the instruction, and it was denied by the court.

The defendant now claims that it was plain error for the trial court not to have given an instruction to which the defendant had earlier objected.

We have held that under the doctrine of "invited" error, a party may not complain where he has been the instrument for in-

---

1. Those instructions are:

### INSTRUCTION 20

The evidence presented in this case has raised an affirmative defense of self-defense and defense of others.

The prosecution has the burden of proving the guilt of the defendant to your satisfaction beyond a reasonable doubt as to the affirmative defense, as well as to all the elements of the crime charged.

After considering the evidence concerning the affirmative defense, with all the other evidence in this case, if you are not convinced beyond a reasonable doubt of the defendant's guilt, you must return a verdict of not guilty.

### INSTRUCTION 21

It is an affirmative defense to the crimes of assault in the first degree, criminal attempt to commit second degree murder and crime of violence with a deadly weapon and second degree assault that the defendant used physical force upon another person

1. in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by the victim, and

2. he used a degree of force which he reasonably believed to be necessary for that purpose.

### INSTRUCTION 22

It is fundamental that the law of self-defense, which is emphatically a law of necessity, involves the question of one's right to act upon appearances, even though such appearances may prove to have been deceptive; also the question of whether the danger is actual or only apparent, and as well the fact that actual danger is not necessary, in order to justify one in acting in self-defense. Apparent necessity, if well grounded and of such a character as to appeal to a reasonable person, under like conditions and circumstances, as being sufficient to require action, justifies the application of the doctrine of self-defense to the same extent as actual or real necessity. Thus, the totality of circumstances must be considered by the trier of fact in evaluating the reasonableness of the accused's belief in the necessity of defensive action and the reasonableness of force used by him to repel the apparent danger.

### INSTRUCTION 23

If the defendant was where he had a right to be, he was not required to retreat to a position of no escape in order to claim the right to employ force in his own defense.

### INSTRUCTION 25

It is Mr. Collins defense that the evidence establishes he removed his .22 rifle from his car in self defense and in the defense of Laura Conn and William Humes, fearing death or serious bodily harm to himself, Miss Conn or Mr. Humes. Mr. Collins believes his perception of threatened danger from Mr. King was reasonable, having just seen and experienced Mr. King's reckless, aggressive and dangerous driving, which appeared to him to apparently be intended to seriously harm the people in Mr. Collins car. Mr. Collins did not intend to shoot Mr. King with the rifle prior to Mr. King attacking him as he held the rifle, but hoped that the exhibition [sic] of the rifle would frighten Mr. King from continuing his assaultive behavior.

When Mr. King grabbed the rifle and seemed to have a chance of taking it from Mr. Collins, Mr. Collins determined that he would have to shoot the rifle, if he could, to prevent Mr. King from shooting Mr. Collins, Mr. Humes or Miss Conn.

Mr. Collins shot Mr. King three (3) times after wresting the rifle from Mr. King, and stopped shooting as soon as it appeared to him that Mr. King had ceased his aggression and was incapacitated.

jecting error in the case; he is expected to abide the consequences of his acts. *People v. Shackelford*, 182 Colo. 48, 511 P.2d 19 (1973); *see also United States v. Irwin*, 654 F.2d 671 (10th Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). We hold that any error was error injected by the defendant as a matter of trial strategy, and the defendant may not now be heard to complain.

## X.

The defendant next contends that the trial court erred in allowing a lay witness to testify as to an opinion which embraced an ultimate issue to be decided by the trier of fact. We disagree.

The colloquy which is the subject of the defendant's contention reads:

Q [by the prosecutor] Did you have an opinion during this period of time whether there was a necessity to use a deadly weapon in this case?

MR. ROOT [defense counsel]: I don't think he is qualified to make that observation. I don't think it is relevant. Mr. Humes isn't the person in issue here.

MR. JAYNES [the prosecutor]: I think a person who has facts and personal observations can render an opinion.

THE COURT: Objection overruled. I will allow him to express his opinion.

A [by Humes] No.

Q (by Mr. Jaynes) Why not?

A [by Humes] A fight is a fight.

Q [by the prosecutor] What do you mean, a fight is a fight?

A [by Humes] If two people are going to fight, why pull a rifle.

I myself don't know why it was pulled.

To determine whether the above testimony was properly admitted, we look to C.R.E. 704, 701 and 403. We begin our analysis with C.R.E. 704.

C.R.E. 704 states:

Opinion On Ultimate Issue. Testimony in the form of an opinion or inference

otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Helpful to our analysis of this issue is the Committee Comment to C.R.E. 704, which states:

The present Federal and Colorado rules may conflict with preceding Colorado case law. (*Compare Bridges v. Lintz*, 140 Colo. 582, 346 P.2d 571 (1959) and *McNelley v. Smith*, 149 Colo. 177, 368 P.2d 555 (1962).) *It is felt that the rule expresses the better alternative.* The conflict arises in the area of lay witnesses testifying as to an ultimate issue of fact. In Colorado, case law says that he may testify concerning things which would "help" the jury to understand the facts, but he may not render an opinion on the ultimate fact in issue. *Mogote-Northeastern Consolidated Ditch Co. v. Gallegos*, 70 Colo. 550, 203 P. 668 (1922). There are exceptions to the rule, and the law in Colorado can best be stated by quoting the following language: "It is reversible error to allow an opinion as to ultimate facts unless the witness testifies as an expert or his testimony invokes a description or estimate of condition, value, etc. or when it is difficult or impossible to state with sufficient exactness the facts and their surroundings." *Town of Meeker v. Fairfield*, 25 Colo.App. 187, 136 P. 471 (1913).

(Emphasis added.)

An often expressed concern in allowing a witness (whether expert or lay) to state an opinion as to an ultimate fact is that the witness would be "usurping the functions of the jury." We believe that concern is unfounded. As Wigmore puts it: Such reasoning is "a mere bit of empty rhetoric" and "no legal power, not even the judge's order, can compel them [the jury] to accept the witness' opinion against their own." 7 J. Wigmore, *Wigmore on Evidence* § 1920 (Chadbourn Rev.1978). The federal Advisory Committee Comment on Rule 704 [2] is

---

**2.** C.R.E. 704 is identical to F.R.E. 704 except for an amendment by a provision in the Comprehensive Crime Control Act, effective October 12,

1984. The amendment added the whole of what is now subdivision (b) of the rule, as well as the adaptive language in the form of the first six

consistent with this view. It states in pertinent part:

> The basic approach to opinions, *lay* and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

(Emphasis added); *See generally* 3 D. Louisell and C. Mueller, *Federal Practice* § 395 (1979); 7 J. Wigmore, *Wigmore on Evidence* §§ 1920, 1921 (Chadbourn Rev.1978); *McCormick on Evidence* 30–32 (E. Cleary ed. 1984); 3 J. Weinstein, *Weinstein's Evidence* ¶ 704 (1985).

While Rule 704 does not prohibit a lay witness from testifying to an issue of ultimate fact, obviously, it does not mean a witness may testify that a particular legal standard has or has not been met. The question which elicits the opinion testimony must be phrased to ask for a factual, rather than a legal opinion. Here, the question asked Humes whether "during this period of time ... there was a necessity to use a deadly weapon." It is phrased in a manner designed to elicit a factual opinion. Humes' testimony that, in his opinion, the situation had not required the use of a rifle was a factual response and was permissible opinion testimony under Rule 704. To the extent that our interpretation of C.R.E. 704 conflicts with case law in existence prior to our adoption of the rule, we hold that the rule is the better alternative.

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions, however. Colorado Rules of Evidence 701 and 403 afford ample assurances against the admission of opinions which would merely tell the jury what result to reach. We next analyze the admissibility of Humes' opinion testimony under Rules 701.

C.R.E. 701 states:

**Opinion Testimony By Lay Witnesses.** If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Humes was an eyewitness to the shooting. His opinion was rationally based on his first hand perception, satisfying the first requirement under C.R.E. 701. Therefore, we focus our analysis on the second requirement of whether the opinion was helpful. The pertinent fact in issue was whether the defendant, himself, reasonably believed it was necessary to use deadly force. The defendant claims that this opinion testimony was irrelevant, misleading, and unfairly prejudicial. The basis of the defendant's contention is that the Colorado statute on self-defense, section 18–1–704(1), 8B C.R.S. (1986), mandates that whether the use of physical force upon another person is reasonable is a subjective determination based upon the perception of the person using physical force, not upon an objective, reasonable person.

We agree with the defendant on the self-defense issue that what Humes believed was necessary for the defendant's protection was arguably irrelevant to the pertinent inquiry of what the defendant believed. Accordingly, we hold the testimony was not "helpful" on the issue of self-defense.

However, the trial court also instructed the jury on apparent necessity, and it distinguished the law of apparent necessity from that of self-defense. That instruction read:

> It is fundamental that the law of self-defense, which is emphatically a law of necessity, involves the question of one's right to act upon appearances, even though such appearances may prove to have been deceptive; also the question of whether the danger was actual or only apparent, and as well the fact that actual danger is not necessary, in order to justify one in acting in self-defense. *Appar-*

words of subdivision (a). The amended portion

has no applicability to the case at bar.

*ent necessity,* well grounded and of such a character as to appeal to a *reasonable person,* under like conditions and circumstances, as being sufficient to require action, justifies the application of the doctrine of self-defense to the same extent as actual or real necessity. Thus, the *totality of the circumstances* must be considered by the trier of fact in evaluating the reasonableness of the accused's belief in the necessity of defensive action and the reasonableness of force used by him to repel the apparent danger.

(Emphasis added.)

The defendant claims no foundation was laid for Humes' testimony on apparent necessity, because Humes' testimony was directed toward a legal standard with specific requirements. We disagree.

The defendant contends, "Mr. Humes' idea of what was 'necessary' was irrelevant to Colorado's standard of 'apparent necessity' for the availability of self-defense." The defendant misconstrues applicable Colorado law. In *People v. Jones,* 675 P.2d 9 (Colo.1984), we stated:

> Apparent necessity, if well grounded and of such a character as to appeal to a reasonable person, under like conditions and circumstances, as being sufficient to require action, justifies the application of the doctrine of self-defense *to the same extent* as actual or real necessity.

675 P.2d at 13–14 (emphasis added) (quoting *Young v. People,* 47 Colo. 352, 355, 107 P. 274, 275–76 (1910)). *Jones* and *Young* stand for the proposition that if an objective, reasonable person, under like conditions and circumstances, believes the defendant's use of physical force was necessary, then the defendant is entitled to invoke the subjective, internally minded, affirmative defense of self-defense. The observations of a third person are, therefore, "helpful" to the standard of apparent necessity. Humes' testimony that "a fight is a fight" and "if two people are going to fight, why pull a rifle. I myself don't know why it was pulled" was an opinion based on factual observations which con-

veyed information that a mere description of the participant's behavior could not. We hold that admission of Humes' lay opinion was not erroneous under C.R.E. 701.

■ Finally, we analyze the admissibility of the lay opinion testimony under C.R.E. 403. The defendant contends that the lay opinion was inadmissible under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. We disagree.

The focus of the defendant's contention is that the testimony is inadmissible on the issue of self-defense and, therefore, was prejudicial because it was admitted as relevant to that issue. We disagree. We believe the testimony was relevant to the question of apparent necessity, and that the court's instruction on apparent necessity, as previously set forth, distinguishes the law of self-defense from that of apparent necessity. We hold that the probative value of Humes' testimony was not substantially outweighed by the danger of unfair prejudice, and was, therefore, admissible under C.R.E. 403.

Accordingly, we hold that the admission of the lay opinion was not erroneous.

## XI.

The defendant's final contention is that the combined effect of the errors at trial prevented the defendant from receiving a fair trial and denied him due process of law. Based on the foregoing analysis, we disagree and hold that this last contention is without merit.

## XII.

The People also appeal. They contend the trial court erred in considering any of the juror's affidavits during the defendant's motion for new trial. The People do not have an appealable issue. The trial court denied the defendant's motion for new trial. Therefore, we dismiss the People's appeal.

The judgment and sentence are affirmed.