**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**John O'NEILL, Defendant–Appellant.**

**No. 88SA8.**

Supreme Court of Colorado,
En Banc.

Dec. 10, 1990.
Rehearing Denied Jan. 14, 1991.

---

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard B. Forman, Sol. Gen., Robert M. Petrusak, Asst. Atty. Gen., Donna Skinner Reed, Sp. Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, State Public Defender, Michael J. Heher, Deputy State Public Defender, Denver, for defendant-appellant.

Justice ERICKSON delivered the Opinion of the Court.

This is a capital case in which the jury imposed a sentence of death after returning guilty verdicts on seven counts including first-degree murder. The defendant, John O'Neill, seeks review of both the underlying judgments of conviction and the sentence of death. We reverse the sentence of death, partially reverse the judgments, and remand to the trial court with directions.

I

The defendant, John O'Neill, and John Baca were good friends and were involved in an unlawful marijuana cultivation and trafficking venture. The illicit business was conducted out of three residential properties in Jefferson county. A house on South Balsam street was owned by O'Neill. John Baca owned a house on West Rice Place, and Baca's girlfriend, Sandra Cowan, owned a residence on Sheephorn Mountain. Both the Sheephorn and Balsam houses were used to grow marijuana. O'Neill tended the marijuana plants and John Baca, the mastermind of the venture, sold the product, under an agreement to split the profits 50–50. John Baca's son, David Baca, helped O'Neill tend the plants.

Late in the evening of February 2, 1987, O'Neill, his girlfriend, and David Baca went to a movie. At some point, David Baca suggested his father had been stealing marijuana and profits from O'Neill. Later that night, the three returned to O'Neill's house on Balsam and found the house ransacked, and marijuana plants either destroyed or stolen. David Baca stated it must have been his father who had invaded the house, and O'Neill became visibly upset. O'Neill decided to find John Baca, but first armed himself with a .38 caliber revolver. After dropping off his girlfriend, O'Neill and David Baca drove to the Sheephorn residence.

Although John Baca owned the house on Rice Place, he typically spent the night with Cowan at the Sheephorn residence. On February 3, 1987, at approximately 1:00 a.m., Baca arrived at the Sheephorn house. O'Neill and David Baca got to the house an hour later, rang the bell, and identified themselves. After John Baca let the two into the house, O'Neill asked him if he had been around the Balsam house that night. When Baca failed to answer, O'Neill shot him once in the head, and missed him with a second shot. Immediately afterwards, O'Neill and David Baca went to a bedroom where Cowan was lying in bed. Cowan testified that O'Neill said, "John cheated me. You cheated me. Get your hands up in the air and get dressed." O'Neill was holding the gun, and Cowan was so frightened that she could not move or respond. David Baca was also in the room and was also armed with a pistol.

John Baca, who was critically wounded but not yet dead, was moaning. O'Neill left the room and fired another bullet into Baca's temple at point-blank range. O'Neill then returned to the bedroom and asked why Cowan was not dressed. He then asked her the location of the money from the marijuana sales. Cowan told him it was not in the house, at which time O'Neill declared the three of them would go to the Rice Place house to look for the money.

The three got into O'Neill's truck and first started toward O'Neill's house on Balsam. They stayed at the Balsam street house just long enough for Cowan to finish dressing and for O'Neill to show Cowan the damage to his furniture and marijuana plants. Cowan testified that while they were at the Balsam house, O'Neill told her, "I could have killed you just like John Baca. But as long as you work for me and keep your mouth shut you'll live."

After they left the Balsam house, the trio went to the house on Rice Place, where David Baca and Cowan went inside and retrieved approximately $4,000. The three then went back to the Sheephorn residence where John Baca's body still lay. O'Neill sent David Baca and Cowan into the bed-

room to pack some clothes for Cowan, and began trying to clean the blood stains on the wall and carpet. O'Neill asked Cowan for rags and cleaning solvents, and Cowan told him to look under the sink. Later, O'Neill asked Cowan for a sheet to cover Baca's body. He told Cowan she would have to help him get rid of the body, and when she refused, she was told she would have to return the next day and clean up the blood.

O'Neill then returned to the master bedroom and looked in Baca's wallet for more money. Cowan told him Baca kept his money in his pants pocket, and O'Neill went out and stripped the body of approximately $1,000 cash. Cowan then told O'Neill she needed money O'Neill owed her, and O'Neill paid her $500.

At approximately 4:30 a.m., the three went back to the Balsam street house, Cowan and Baca in John Baca's truck, and O'Neill in his Datsun pickup. O'Neill left, telling Baca to "watch" Cowan, and returned about one hour later with his girlfriend and her small child. O'Neill and his girlfriend slept for awhile, and then O'Neill left for a 10:00 a.m. dentist appointment and Baca fell asleep. It was then that Cowan escaped, ran to a neighbor's house, and told the occupants, "I've seen a murder. They're going to murder me. Please call the police. Help me." The Jefferson County Sheriff's Department was called, and subsequently Baca turned himself in to the authorities and O'Neill was arrested.

David Baca entered into a plea agreement and testified against O'Neill. On November 16, 1987, the jury convicted O'Neill of first-degree murder with deliberation,[1] felony murder,[2] second-degree kidnapping,[3] felony theft,[4] misdemeanor theft,[5] cultivation of marijuana,[6] and one mandatory sentencing count under section 16-11-309, 8A

C.R.S. (1986). The state then sought the death penalty on the basis of three statutory aggravating factors: that the killing was performed for pecuniary gain, was performed in furtherance of another felony (second-degree kidnapping), and was especially cruel, heinous, or depraved. The jury found that the murder was committed for pecuniary gain and in furtherance of another felony, but did not find that it was cruel, heinous, or depraved. The jury also found that the aggravating factors outweighed the mitigating factors and determined, on November 18, 1987, that death was the appropriate penalty.

On appeal, the defendant, through his counsel, submitted a 346 page "partial" opening brief in which he asserts 52 errors, which he maintains require reversal of both the sentence and the underlying judgments. These claims can be broken down into roughly four areas: issues relating to jury voir dire, to the substantive offenses, to the sentencing phase, and other miscellaneous claims. In addition to specific statutory violations, O'Neill claims trial court errors resulted in violations of his constitutional right to trial by jury and to counsel, and his rights under the cruel and unusual punishment and due process clauses of the United States and Colorado Constitutions.[7]

## II

### A

O'Neill contends that the trial court unreasonably restricted his counsel's voir dire of prospective jurors regarding claimed hardships and the effects of publicity in violation of Crim.P. 24.[8] Rule 24 provides that, after the judge has asked the prospective jurors "any questions which he believes are pertinent to their qualifications to serve as jurors,"

1. § 18-3-102(1)(a), 8B C.R.S. (1986).

2. § 18-3-102, 8B C.R.S. (1986).

3. § 18-3-302, 8B C.R.S. (1986).

4. § 18-4-401(2)(c), 8B C.R.S. (1986).

5. § 18-4-401, 8B C.R.S. (1986).

6. § 18-18-106, 8B C.R.S. (1986).

7. U.S. Const. amends. V, VI, VIII, XIV; Colo. Const. art. II, §§ 16, 20, 23, 25.

8. Unless otherwise stated, all statutory or rule references will be as they were in effect on the date of this offense or trial.

The parties or their counsel shall be permitted to ask the prospective jurors additional questions. In order to eliminate undue delay, the judge may reasonably limit the time available to the parties or their counsel for voir dire examination. If, in the opinion of the court, the examination by the parties or counsel is unduly repetitious, irrelevant, unreasonably lengthy, abusive, or otherwise improper, the court may limit or terminate such examination.

■ O'Neill correctly asserts that he is entitled to a fair and impartial jury under both the United States and Colorado Constitutions. The right to an impartial jury does not, however, require that counsel be granted unlimited voir dire examination. *See* Discussion, *Voir Dire Criticism and Comment*, 47 Den.U.L.Rev. 465 (1970). Nor is counsel entitled to voir dire the jury as a matter of constitutional law. *Luera v. Snyder*, 599 F.Supp. 1459 (D.Colo.1984). We have said, however, that counsel has the right to propound questions to a jury. *Zancannelli v. People*, 63 Colo. 252, 165 P. 612 (1917). Moreover, unlike the federal system, rule 24 provides counsel the right to question jurors, although the scope and extent of that right may be limited within the discretion of the trial court. *People v. Collins*, 730 P.2d 293, 300 (Colo.1986). The question here is whether O'Neill was afforded or waived that right.

O'Neill complains that the trial court unduly restricted his counsel's questioning of jurors regarding claimed hardships. Yet the voir dire in this case was extensive. Both the court and counsel questioned potential jurors on a variety of topics, and that questioning spanned 1,124 pages of record. Although the defendant complains that the court ordered defense counsel not to participate in voir dire regarding claimed hardships or publicity issues, counsel were specifically requested to write questionnaires and submit them to the trial court. The court then stated it would determine the issues regarding juror hardship and any issue relating to publicity. Defense counsel was asked and specifically agreed to the court's procedure. No objection by defense counsel appears in the record. Because of the record before us, O'Neill cannot complain on appeal that the very procedure he agreed to through his counsel was unconstitutional.

■ The procedure employed by the trial judge, while open to criticism, complies with a long line of cases in this state. In *Collins*, we stated that voir dire examinations were not without limitations, and, "The propriety of questions to potential jurors on voir dire is within the discretion of the trial court, and its ruling thereon will not be disturbed on appeal unless an abuse of that discretion is shown." 730 P.2d at 300. *See also Brake v. People*, 191 Colo. 390, 553 P.2d 763 (1976); *People v. Buckner*, 180 Colo. 65, 504 P.2d 669 (1972). Defense counsel objected on general grounds to some of the decisions by the court to excuse jurors. O'Neill has not shown, however, that either the procedure or the trial court's decisions were an abuse of discretion. Those decisions and procedures complied with both rule 24 and the United States and Colorado Constitutions, and therefore were not error. As long as the examination allowed counsel to determine whether any potential jurors possessed any beliefs that would bias them such as to prevent O'Neill from receiving a fair trial, then the purpose of voir dire has been fulfilled. *People v. Mackey*, 185 Colo. 24, 521 P.2d 910 (1974). We find the voir dire examination fulfilled its purpose, and counsel had sufficient information on which to base a decision regarding challenges.

O'Neill points to several individual jurors that he claims the court failed to adequately examine regarding claimed hardships or exposure to publicity. None of these examples constitute an abuse of discretion. The court extensively questioned individual jurors regarding hardships and publicity, and made sound decisions concerning who to excuse. Again, O'Neill fails to show an abuse of discretion. Moreover, O'Neill failed to use all of his peremptory challenges, and "there was no evidence the jury was tainted with prejudice as a result of pretrial publicity" or because of the excuse or nonexcuse of jurors for hardship. *Peo-*

*ple v. Simmons,* 183 Colo. 253, 254–55, 516 P.2d 117, 118 (1973).

### B

■ O'Neill complains that the trial court's refusal to ensure that all the prospective jurors stayed in the courtroom while others were being questioned amounted to reversible error. O'Neill cites no legal authority, and has failed to show that he was prejudiced in any way by a few jurors leaving the court to use the restroom. Counsel was aware at the time that the jurors had left momentarily, and could have ensured that those jurors were aware of any statements made while they were gone and could have questioned the prospective jurors on the panel during voir dire regarding their absence from the courtroom. In addition, the trial court instructed the jurors not to leave after the situation was brought to the court's attention. We hold that this claim does not warrant reversal.

### C

O'Neill also contends many potential jurors were excused because of their views of the death penalty when they were actually qualified to sit on the jury. O'Neill points to three jurors: Shioshita, Witherspoon, and Winnell.

As a preliminary matter, O'Neill claims that certain statements made by the prosecutor during voir dire misled jurors into making statements about their death penalty beliefs they would not otherwise have made. We find nothing in the record to support that claim. The trial court instructed potential jurors on the law in Colorado regarding the death penalty and their function in the sentencing phase should they find the defendant guilty of first-degree murder. Statements by both the prosecution and defense counsel were either harmless or were accurate representations of the jury's duty at the penalty phase of the trial.

Because it is for the jury to determine whether death is an appropriate sentence, it is equally appropriate to question potential jurors on their beliefs concerning the death penalty. The issue here is to what extent the answers to those questions can serve as justification to excuse a juror for cause. The United States Supreme Court addressed that issue in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and upheld the excuse of a juror for cause in a Florida capital case.

In *Witt,* the state asked the juror whether she had any religious or personal beliefs against the death penalty. The juror answered

[A] I am afraid personally but not—

. . . .

[Q] Now, would this interfere with you sitting as a juror in this case?

[A] I am afraid that it would.

*Id.* at 416, 105 S.Ct. at 848. The state successfully challenged the juror for cause, and the defendant argued such a challenge violated his rights to an impartial jury. The defendant relied on *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which held that a state violated the sixth and fourteenth amendments by enacting a statute that essentially permitted excusing all potential members of a jury who expressed reservations about the death penalty. *Id.* at 523, 88 S.Ct. at 1777. *Witherspoon* did not "involve the right of the prosecution to challenge for cause prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt." *Id.* at 513, 88 S.Ct. at 1772. In a footnote, however, the Court said:

> Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. . . . The most that can be demanded . . . is that he will be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has began, to vote against the penalty of death. . . .

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21. The footnote also stated that exclusion for cause was allowed for any jurors who

> made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed ... or (2) that their attitude towards the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* That standard was rejected in *Witt.*

The Court said such a standard might be appropriate when the jury was given unlimited discretion to decide the death penalty issue, such as in *Witherspoon.* Since its decisions in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), however, sentencing juries can "no longer be invested with such discretion." *Witt*, 469 U.S. at 422, 105 S.Ct. at 851. The Court found that the appropriate standard was "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424, 105 S.Ct. at 852 (citations omitted). Likewise, the *Witt* standard "does not require that a juror's bias be proved with unmistakable clarity." *Id.*

■ O'Neill acknowledges the trial court followed the *Witt* standard in determining whether to grant challenges for cause. O'Neill claims, however, that the proper standard in Colorado is the older *Witherspoon* criteria, and that none of the three jurors stated they would automatically impose a life sentence, or that their views would impair their ability to determine the defendant's guilt. O'Neill points to *Stratton v. People*, 5 Colo. 276 (1880), in which we stated, "Conscientious scruples, to disqualify, must be such as to preclude a finding of guilty in accordance with the law and the evidence." *Id.* at 279. O'Neill ignores, however, the context in which *Stratton* was decided. In 1880, the laws of Colorado provided that the court could order the death penalty upon a jury finding of guilt either of murder with deliberation or felony murder. The jury's only function was the traditional guilt or innocence determination.[9] O'Neill's jury, on the other hand, had two separate duties: to determine his guilt, and, if it found him guilty, to determine if death was an appropriate sentence under the laws of Colorado. If a juror's views would prevent or substantially impair the performance of either duty, then a challenge for cause was appropriate. *Stratton* stands for this proposition as well: "If notwithstanding his conscientious scruples, he will render a verdict in accordance with the law and evidence, and if upon this point his answers leave no uncertainty, this is all the law requires." *Id.* at 277.

Moreover, in *People v. Davis*, 794 P.2d 159, 204 (Colo.1990), we responded to the same argument put forth by O'Neill, and expressly adopted the *Witt* standard.

### 1. Mrs. Shioshita

■ O'Neill first claims juror Shioshita was improperly excused. Defense counsel, however, when asked by the court to respond to the state's challenge for cause, stated, "Judge, we certainly don't have any quarrel with the state of the record as to People's motion to excuse Mrs. Shioshita." We agree there is no quarrel with the challenge for cause of this juror. When asked:

> [Q] are there no circumstances that you can think of where the death penalty would be appropriate?
>
> [A] Well, I believe in life in prison and correction.

Although Mrs. Shioshita vacillated somewhat earlier when asked if she could impose the death penalty, it is clear that even defense counsel considered her testimony against the death penalty strong enough to justify an excuse for cause. Granting the challenge for cause was not reversible error.

### 2. Mr. Witherspoon

■ O'Neill next argues juror Witherspoon should not have been excused. The following colloquy took place:

---

**9.** *See* Colo. General Laws Ch. XXIV, Criminal Code, § 268 (1877).

[The State] Are you so inclined at this point that you could not consider the death penalty as appropriate under any circumstances [and] therefore could not vote?

[A] Okay. Well, I just have a problem saying yes or no because like it would be status quo, like if would the Judge or the Court show like cases that would be appropriate for the death penalty to us to decide if it should be applied in the case?

[Q] I think—

[A] I've never really dealt with it, you know.

At this point, the prosecutor outlined the jury's function at the sentencing stage, and pointed-out that the jury could consider only statutory aggravators and any mitigating circumstances it wished—essentially that the jury would be given some direction—but that the jury would not be given other death penalty cases to weigh with this one.[10] Mr. Witherspoon then stated,

I would probably determine life imprisonment over the death penalty just because I don't feel I know enough about the death penalty to place it on anyone. I know the law states certain facts *but morally I just can't accept it.*

. . . .

[Q] I don't want to put words in your mouth, but are you telling me that there are circumstances or cases in which you feel the death penalty would be appropriate and if you were a juror on that case could vote for the death penalty?

[A] Okay.

[Q] Is that a yes?

[A] Yes.

(Emphasis added.) Mr. Witherspoon later stated that the only way he could impose the death penalty would be if the defendant's prior record indicated he could not be rehabilitated, and only then could he follow the judge's instructions and his oath. The trial court followed up by inquiring:

I really need to get a sense from you whether you could follow the law and determine the facts and follow your oath to do that or is your feeling about the death penalty such that you think it would interfere with your ability to follow your oath as a juror?

[A] In completing the whole trial, yes it would interfere with my oath to follow the law because I could, I could sit back and go through the trial and weigh the facts on, on if he's guilty or not guilty of premeditated murder, but I don't know if I could morally accept imposing the death penalty on anybody.

The trial court's question was almost a verbatim rendition of the *Witt* standard, and the juror's answer was sufficient evidence that his beliefs would substantially impair him from performing his duties to justify his excuse for cause. While he never stated that he would absolutely not consider the death penalty, we do not require such a showing. The trial court's decision to excuse Mr. Witherspoon was not error.

### 3. Mrs. Winnell

▮▮▮▮ Mrs. Winnell specifically stated she did not think she could vote for the death penalty under any circumstances. When asked by defense counsel whether she could impose the death penalty even for a child killing, her response was,

No, I don't think I could, even in a situation like that which to me is the worst offense you could probably commit. I would still vote for life imprisonment. . . .

When pressed by defense counsel, Mrs. Winnell stated she could follow the law and consider the death penalty. The trial court granted a challenge for cause, and said

listening to her and listening to her demeanor during the questioning is that her view would substantially impair her performance of her duties as a juror. While at the very, very end she did say I could consider it, that was really after quite a bit, don't take offense Mr. Ran-

---

**10.** The prosecutor stated that weighing cases was the job of the Supreme Court. O'Neill claims that this oblique reference should have led to a mistrial since any reference to appealability would tend to make the jury feel less responsible in making its decision. We find no merit in that claim. Most citizens know there is an appellate process, and a simple, short reference to that process is hardly prejudicial enough to require a mistrial.

some [defense counsel], badgering, badgering or really pushing and prodding by Mr. Ransome to get her to say what he wanted her to say.

We can find no error in this reasoning. It is the duty of the trial judge, after listening to the prospective juror's answers, to make a decision on whether that juror can perform her duty and oath when the time comes. So long as there is reason to believe the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions or oath, we will not overturn the trial court's decision save for an abuse of discretion. We find no such abuse here.

### D

O'Neill claims there were three other jurors who should have been excused for cause because they expressed views in support of the death penalty. O'Neill's assertion that the jury was "organized to return a verdict of death" is simply not supported by the record, nor has he shown how he was prejudiced by the three jurors as they did not serve on the jury and since the defense did not exhaust its peremptory challenges. *See People v. Silvola,* 190 Colo. 363, 547 P.2d 1283, *cert. denied,* 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976) (question of abuse of discretion not reached unless defendant can show (1) he exercised all of his peremptory challenges, and (2) he was denied the right to challenge other prospective jurors because he was forced to exhaust his peremptory challenges to excuse the earlier suspect juror). Because O'Neill has failed to show how he was prejudiced, we find no merit to his claim. O'Neill does not argue for or against any of the jurors based on their ability to determine guilt, but rather only in their views of the death penalty. Since we reverse the imposition of the death penalty in Part IV, the defendant could not have been prejudiced by a challenge aimed only at the death penalty.

### III

### A

O'Neill contends that his conviction for first-degree murder after deliberation must be vacated because he was convicted of two crimes of first-degree murder for the same killing, in violation of *People v. Lowe,* 660 P.2d 1261 (Colo.1983). He then asks us to merge the second-degree kidnapping charge into the felony murder conviction and vacate the kidnapping conviction.

In *Lowe,* we stated the rule of lenity required the first-degree murder statute be construed in favor of the defendant, and "that construction is that a defendant can be convicted only of one first-degree murder for one killing." *Id.* at 1269. We held that murder after deliberation and felony murder were alternatives ways in which to commit first-degree murder, and the proper procedure was to inform the jury

> that the defendant is charged with one crime, first-degree murder. The jury's special verdict should indicate which theories of first-degree murder, if any, have been proved by the evidence. . . . If the jury is asked only for a general verdict, then on appeal there is no way to decide upon which theory the jury reached its verdict. In such a case an error relating to either count would void the entire verdict.

*Id.* at 1271. We adhered to *Lowe* in *People v. Bartowsheski,* 661 P.2d 235, 246 (Colo. 1983), and more recently in *People v. Saathoff,* 790 P.2d 804, 807 (Colo.1990).

The instructions in O'Neill's trial did not comply with *Lowe.* Instruction 11 stated that each count was a separate offense, and there were separate instructions for first-degree murder after deliberation and felony murder. In the mittimus, the trial court sentenced O'Neill to death on "Counts 1 *and* 2." (Emphasis added.) We find that the trial court violated the *Lowe* requirements in imposing judgment and sentence for two different counts of first-degree murder for the same killing.

However, we reject O'Neill's contention that we must vacate the conviction for first-degree murder after deliberation. The jury found O'Neill guilty of both Count 1 (murder after deliberation) and Count 2

(felony murder).[11] There is ample evidence to support a finding of murder after deliberation.[12] As in *Lowe,* we remand to the trial court to "prepare an amended judgment of conviction, sentence, and mittimus to reflect that the defendant has been convicted of murder in the first-degree in violation of" section 18–3–102, 8B C.R.S. (1986). *Lowe,* 660 P.2d at 1272.

■■■ Because the elements of second-degree kidnapping "do not include proof of the same facts necessary to establish the commission of" first-degree murder, *Bartowsheski,* 661 P.2d at 246, we reject O'Neill's request to merge the two convictions into one.

### B

■■■ O'Neill claims the instruction pertaining to the elements of second-degree kidnapping was constitutionally defective and argues that we should vacate that conviction. The same issue was raised and decided adversely to O'Neill in *People v. Davis,* 794 P.2d at 186–88. Instruction 17 provided in pertinent part:

The elements of the crime of Second Degree Kidnapping are:

1. That the defendant,
2. in the State of Colorado, at or about the date and place charged,
3. knowingly,
4. forcibly or otherwise, seized and carried any person from one place to another,
5. without his/her consent,
6. without lawful justification, and
7. by the use of a deadly weapon.

O'Neill contends the jury was misled into believing "knowingly" applied only to element 4, and that the jury did not understand O'Neill had to also know Cowan did not consent in order to be found guilty.

The state correctly asserts that all instructions were specifically accepted by defense counsel without objection, and thus the standard on review is whether there was plain error. *People v. Cowden,* 735 P.2d 199, 202 (Colo.1987) ("Plain error affects substantial rights of the accused, Crim.P. 52(b), and the record must demonstrate a reasonable possibility that the alleged erroneous instruction contributed to the defendant's conviction." (Citations omitted.)). In this instance, however, we find no error at all, plain or otherwise.

In *People v. Powell,* 716 P.2d 1096 (Colo. 1986), we addressed this very question and held that section 18–3–302, 8B C.R.S. (1985 Supp.), was unconstitutionally vague because its wording, "any person that knowingly, forcibly, or otherwise" seized and carried away a person without consent or legal justification was guilty of second-degree kidnapping, left persons of ordinary intelligence to "necessarily guess as to its meaning and differ as to its application." 716 P.2d at 1101 (citations omitted). We found that one interpretation was a person could be guilty of second-degree kidnapping if he *either* knowingly, *or* forcibly, *or* otherwise seized and carried away the victim. We upheld the statute, however, by excising the "forcibly or otherwise" clause and giving effect to the remaining language. *Id.* In addition, despite excising words from the statute, we affirmed the defendant's conviction "because the jury was instructed that a guilty verdict on the kidnapping charge could only be based on proof beyond a reasonable doubt" of each and every element. *Id.* at 1102. The instruction in *Powell* closely resembled the instruction at issue here.

■■■ As in *Powell,* the instruction at issue set out "knowingly" as a separate element, and required proof beyond a reasonable doubt that O'Neill was guilty of each and every element before the jury

---

**11.** Defense counsel admitted to the jury during voir dire, opening statement, and closing argument that O'Neill shot Baca.

**12.** O'Neill claims that there was insufficient evidence to establish that the murder was in furtherance of the kidnapping, and that there were erroneous instructions relating to the requirements establishing the kidnapping as an underlying felony for the purpose of finding guilt of felony murder. Because we have instructed the trial court to vacate the conviction for felony murder, we do not reach these claims.

could find him guilty of second-degree kidnapping. "To the extent that the instruction might have conveyed the impression that the prosecution was required to prove [O'Neill] forcibly seized and carried away [Cowan], any error inured to the benefit of the defendant and cannot be the basis for a reversal of his conviction." *Id.* at 1102–03.

### C

■■■ O'Neill alleges that a number of errors occurred in the trial of the felony theft charges. Specifically, O'Neill complains the instruction did not apply "knowingly" to the element of "without authorization or by threat or deception."[13] Defense counsel accepted this instruction without objection and without tendering an alternative. The instruction was given in the statutory language and was sufficient to inform the jury adequately of the law. *People v. Bowen*, 182 Colo. 294, 512 P.2d 1157 (1973). A special instruction on "knowingly" as applied to "without authorization" is not required. *See People v. Gresham*, 647 P.2d 243, 244 (Colo.App. 1981).

■■■ O'Neill also asserts, and the state concedes, that the definition of "property of another" was taken from a statute not yet promulgated at the time of the offense. The court instructed the jury that property of another meant "property is that of another if anyone other than the defendant has a possessory or proprietary interest therein." O'Neill claims this language is drawn from the 1987 amendment to section 18-4-401 to limit our decision in *People v. Clayton*, 728 P.2d 723 (Colo.1986), in which we stated that partnership property is not property of another in the context of a theft charge against a partner.

O'Neill next argues that the evidence is insufficient to convict him of theft since what he took was actually partnership funds belonging both to Baca and to himself. In the alternative, O'Neill claims that he had David Baca's permission, as the heir of his father's estate, to take the money.

■■■ O'Neill admits that no objection was offered by defense counsel concerning the instructions, nor did counsel offer an alternative instruction on the issue of partnership funds. Our review of any alleged error, then, is under a plain-error standard. *Cowden*, 735 P.2d at 202. There is no serious doubt as to the reliability of the theft conviction. Not only did defense counsel fail to object to the instruction given, but he affirmatively argued to the jury that O'Neill *should* be convicted of theft.

> [W]e are not asking for technicalities. Convict him guilty of theft even though it's partially his own money, actually half. Go ahead. Don't use technicalities, I'm telling you. Convict him because you know all we want is what he's really guilty of.... Throw the book at him. He will pay.

Earlier defense counsel told the jury,

> We told you from the start that John was guilty and we are not asking you to get him off. We are not asking you to decide this case on any technicalities whatsoever and there are charges that if you look at technicalities you might not convict him. We are not even going to talk about it. All we are asking you to do is to convict him of what he was really guilty of,

and

> If you have a reasonable doubt as to whether or not she [Cowan] was kidnapped, your verdict has to be not guilty

---

**13.** The instruction complained of, No. 19, provides in pertinent part:

The elements of the crimes of Theft, $300— $10,000, are:
1. That the defendant,
2. In the State of Colorado, at or about the date and place charged,
3. knowingly,
 a. obtained or exercised control over
 b. anything of value

 c. which was the property of another person,
4. without authorization or by threat or deception, and
5. with intent to permanently deprive the other person of the use or benefit of the thing of value, and
6. the value of the thing involved is three hundred dollars or more, but less than ten thousand dollars.

on that charge. And that is the only charge that we are going to ask for a not guilty verdict on. We are going to ask you to convict him of a degree of homicide. I'm going to let you convict him of everything else, just go ahead and do it, whether or not there's [sic] technicalities.

In addition to arguing that the jury should convict O'Neill of theft, defense counsel stated, "Now, there's been some characterization of him [O'Neill] as a partner, but if you get a feel or sense for what it really was, you can see it wasn't really that way. They weren't equals."

The evidence established that O'Neill removed the money from Baca's person and from a house owned by Baca. There is no substantial evidence that O'Neill was authorized to take the money by John Baca or anyone else. The evidence, when viewed in the light most favorable to the prosecution, is sufficient to support a finding beyond a reasonable doubt that O'Neill was not entitled to the money and therefore committed theft.

Under these circumstances, the instruction did not so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the guilty verdict for felony theft. *See Wilson v. People*, 743 P.2d 415, 420 (Colo.1987). O'Neill's claim of error must be rejected.

### D

O'Neill asserts the trial court erroneously entered a separate judgment of conviction and sentence for a crime of violence under section 16–11–309, 8A C.R.S. (1986), and we should therefore reverse that conviction. The crime of violence was properly charged as a separate count as required by section 16–11–309(4), and the

trial court entered a single sentence for counts 3 (second-degree kidnapping) and 4 (crime of violence). The applicable jury instruction set out the elements required by section 16–11–309, and the jury returned a verdict of guilty on that count. That special finding "serves as a basis for the mandatory sentence which *must* be imposed on the defendant's conviction for the separately charged substantive offense." *People v. Russo*, 713 P.2d 356, 364 (Colo. 1986) (emphasis added). We find no merit to the defense claim and affirm the jury finding of a crime of violence.

### IV

The penalty, or "sentencing," phase of a criminal trial is governed by section 16–11–103, 8A C.R.S. (1986 & 1990 Supp.). That statute was substantially amended by the General Assembly in 1988. The prior statute was in effect on the date of the offense at issue here, and is therefore controlling.[14]

After a defendant has been found guilty of a capital offense, and the parties have argued their positions, the jury must determine whether death or life imprisonment is the appropriate sentence. At the time of O'Neill's offense, that determination involved a four-step process culminating in a final decision by the jury whether to sentence O'Neill to death. The jury first determines if at least one statutory aggravating factor exists. §§ 16–11–103(2)(a)(I), –103(6).[15] If the jury unanimously finds the state has proven at least one aggravating factor beyond a reasonable doubt, it must next determine whether any mitigating factors exist. §§ 16–11–103(2)(a)(II), –103(5). There is no burden of proof for mitigating factors, and the jury does not

---

**14.** Unless otherwise noted, all references to section 16–11–103 in this opinion are to the version in effect at the times relevant to the O'Neill trial.

**15.** The statutory factors relied on by the state against O'Neill were that:

 1. The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants. § 16–11–103(6)(g);

 2. The class 1 felony was committed for pecuniary gain. § 16–11–103(6)(h);

 3. The defendant committed the offense in an especially heinous, cruel, or depraved manner. § 16–11–103(6)(j).

The jury found that the state proved beyond a reasonable doubt factors 1 and 2, but did not find that factor 3 existed. O'Neill cites numerous errors regarding factors 1 and 2. Because we reverse the death sentence for other reasons, we do not reach those claims.

have to unanimously agree that any mitigating factor exists. § 16–11–103(1)(d). Third, the jury must determine whether "sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist." § 16–11–103(2)(a)(II). Finally, if the jury does not find that mitigating factors outweigh any aggravating factors, its fourth step is to decide "whether the defendant should be sentenced to death or life imprisonment." § 16–11–103(2)(a)(III). There is no statutory burden of persuasion attached to the third or fourth step.

We recently addressed the burden of proof and persuasion requirements for steps three and four in *People v. Tenneson*, 788 P.2d 786 (Colo.1990). In *Tenneson*, we stated, "Because of the unique severity and finality of a sentence to death, the United States Supreme Court has emphasized the heightened need for sentencing reliability in capital cases." *Id.* at 791. *See Lowenfield v. Phelps*, 484 U.S. 231, 238–39, 108 S.Ct. 546, 551, 98 L.Ed.2d 568 (1988). That concern for reliability is expressed in cases "requiring that a jury's determination to impose the penalty of death reflect the convictions of each juror, guided by constitutionally sufficient statutory standards." *Tenneson*, 788 P.2d at 792 (citing *Gregg v. Georgia*, 428 U.S. at 195, 96 S.Ct. at 2935).

In order to ensure reliability, and not impose a sentence of death in violation of the United States and Colorado Constitutions,[16] a capital sentencing scheme must meet at least two requirements. "First, the discretion of the sentencer must be 'suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" *Id.* (quoting *Gregg*, 428 U.S. at 189, 96 S.Ct. at 2932). "The statu-

tory scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Tenneson*, 788 P.2d at 790 (citations omitted). Colorado has chosen to narrow that class by statutorily prescribing the aggravating circumstances that the jury must find exist, beyond a reasonable doubt, before the death penalty may be imposed. §§ 16–11–103(2)(a)(I), –103(6).

The second requirement is that the sentencing scheme "must allow the sentencing body to consider any relevant mitigating evidence regarding the defendant's character and background and the circumstances of the offense." 788 P.2d at 792 (citations omitted).

In *Tenneson*, we held:

An instruction to the jury that they must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory factors before a sentence of death can be imposed adequately and appropriately communicates the degree of reliability that must inhere in the balancing process.

*Id.* at 792. The third step instruction adopted by *Tenneson* mandates that a jury move on to the fourth step in the unlikely event it finds that, beyond a reasonable doubt, the mitigating and aggravating factors are exactly in balance. *Id.* at 796; *see also People v. Davis*, 794 P.2d 159, 190 (Colo.1990).[17]

Unless the jury finds that the mitigating factors outweigh the proven statutory factors, it must move on to step four and determine whether death is the appropriate penalty.[18] To ensure the reliability of the

---

**16.** U.S. Const. amend. VIII; Colo. Const. art. II, § 20.

**17.** O'Neill's jury was instructed in the penalty phase that in order to sentence O'Neill to death, it was required to find:
1. One or more of the specified aggravating factors exist beyond a reasonable doubt; and
2. Any aggravating factor or factors found to exist outweighs beyond a reasonable doubt any mitigating factor or factors found to exist;
3. Death is the appropriate penalty.

Although this instruction did not comply with *Tenneson*, any benefit inured to the defendant.

**18.** The 1988 amendment eliminated this step. Now,

In the event that the jury finds that at least one statutory aggravating factor has been proved beyond a reasonable doubt, and there are insufficient statutory mitigating factors or other mitigating circumstances to outweigh any statutory aggravating factor or factors that were proved and any other aggravating

verdict, we held in *Tenneson* that the fourth step instruction must require jurors "to return a verdict of death only if they unanimously agreed that death was the appropriate punishment *beyond a reasonable doubt."* *Tenneson,* 788 P.2d at 796 (emphasis added). We stated, "The purpose of these instructions is not to fulfill the traditional function of providing guidance in fact-finding but is to communicate to the jurors the degree of confidence they must have in the correctness of their ultimate conclusion before they can return a verdict of death." *Id.*

The pertinent instructions given to O'Neill's jury at the penalty phase stated:

> The fourth step in your deliberations is to decide whether the defendant shall be sentenced to death or life imprisonment. This decision is solely in your discretion. If one or more jurors finds that life imprisonment is the appropriate penalty, then you must return a verdict imposing a sentence of life imprisonment. On the other hand, if all members of the jury unanimously agree that death is the appropriate penalty, then the jury may return a verdict imposing a sentence of death.

Instruction number 15 provided:

> The fourth step in your deliberations is to determine the penalty to be imposed upon the defendant.
>
> Before imposing a death sentence, you must unanimously be convinced that death is the appropriate penalty for the defendant. Each of you must make your own individual assessment of whether the defendant shall be sentenced to death or to life in prison. Your decision should not be mechanical or mathematical. Your decision should be instead a reasoned judgment as to whether, in your individual assessment, in light of the totality of the circumstances presented in this case and under these instructions of law, the defendant should be sentenced to life in prison or to death. If you are not all convinced that death is the appro-

priate penalty, the sentence must be life imprisonment.

> Regardless of the findings you have made in steps one, two and three, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation.
>
> No juror should ever feel compelled to reach a verdict that is contrary to that juror's conscientious view of what the verdict should be in the case, under the law contained in the Instructions of the Court, just for the sake of reaching a unanimous verdict.

O'Neill argues that the jury was not under any burden of persuasion in its fourth step of deliberations, in violation of *Tenneson.* We agree. *Tenneson* clearly mandates that the jury find that death is the appropriate penalty beyond a reasonable doubt. O'Neill's jury, however, was left to its "sole discretion" "in light of the totality of the circumstances" to determine the appropriate penalty under whatever burden it chose.

The prosecution argues that the burden of proof required of the jury in its determination of aggravating factors negates the need for additional direction on the burden of persuasion in the fourth step. *Tenneson,* in which we said there is a "general need to assure that the jury understands that step four is separate and distinct from step three," and that "the jury should be specifically instructed that the outcome of the balancing process required in step three does not govern the ultimate determination that the jury must make in step four ...," disposes of the prosecution's contention. *Tenneson,* 788 P.2d at 796.

The prosecution next asserts that *Tenneson* should be limited to those situations when there is a danger that the jury will find that the mitigating and aggravating factors are equally balanced, that is, when the jury is instructed that it must find that no mitigating factors outweigh the aggravating factors. That instruction, approved

---

circumstances that were proved, the jury shall return a sentence of death.

§ 16–11–103(2)(b)(III), 8A C.R.S. (1990 Supp.)

in *Tenneson,* was not given to the O'Neill jury, which was instead instructed that it must find that the aggravating factors outweighed any mitigating factors. Because there is no danger that the jury determined death was the appropriate sentence even after finding that all factors were equally balanced, the prosecution argues that there is no need for an instruction requiring persuasion beyond a reasonable doubt in the fourth step. *Tenneson,* however, requires a "beyond a reasonable doubt" instruction in the fourth step regardless of the instructions used in the other three deliberation steps. We stated only that our decision was "reinforced" by the possibility that a jury could find all factors in balance, or equipoise, and still move on to step four. *Id.* The purpose of requiring a high burden of persuasion in the fourth step is not simply to guard against unreliability in the event of equipoise, but rather to ensure the reliability of any jury decision sentencing a defendant to death.

 Because the instructions given to O'Neill's jury did not ensure that reliability, as required by *Tenneson,* the jury's decision to sentence O'Neill to death must be reversed.[19]

### V

O'Neill asserts a number of alleged errors, in addition to issues addressed in this opinion involving, among others, prosecutorial misconduct, the use of photographs, grand jury proceedings, and sufficiency of the indictments. The alleged errors lack merit and require no further exposition or discussion.

We hold that the convictions and judgments for felony murder and murder after deliberation are duplicative, and remand to the trial court with directions to vacate the judgment of conviction, sentence, and mitti-

mus, and to impose judgment against the defendant for murder in the first-degree in violation of section 18–3–102, 8B C.R.S. (1986).

We additionally hold that the penalty phase jury instructions relating to the fourth step in determining whether death was the appropriate sentence violated the requirements set forth in *People v. Tenneson.* We therefore reverse the sentence of death and remand to the trial court with directions to vacate the death sentence and to sentence the defendant to life imprisonment on the judgment of first-degree murder, as required by section 16–11–103(8)(b). We affirm all other convictions, judgments, and sentences.

QUINN, J., specially concurs.

VOLLACK, J., dissents in part and concurs in part, and ROVIRA, C.J., joins in the concurrence and dissent.

Justice QUINN specially concurring:

I specially concur in the judgment. In Part IV the court relies on *People v. Tenneson,* 788 P.2d 786, 796 (Colo.1990), and holds that the trial court erred in failing to instruct the jury that, in the fourth phase of the deliberative process on punishment, the jurors must unanimously agree that death is the appropriate punishment beyond a reasonable doubt before a death verdict can be returned. I agree with this disposition. Because this error requires the reversal of the death sentence, I see no need to address either the trial court's disqualification of three jurors because of their beliefs concerning capital punishment (Part IIC), or the trial court's refusal to disqualify several jurors because of their views supportive of capital punishment (Part IID).

---

19. The dissent asserts that, subsequent to *Tenneson,* we rejected the argument that a "beyond a reasonable doubt" standard was required in the fourth step because it was different from the third step in *People v. Davis,* 794 P.2d 159 (Colo. 1990). In *Davis,* the dissent admitted that instruction 2, discussing the fourth step, required the jury to find that "the prosecution [ ] prove[d] *beyond a reasonable doubt* that death [was] the

appropriate penalty," *id.* at 229. No issue relating to the sufficiency of the jury instruction on the reasonable doubt standard of step four was presented. *Id.* Davis does not present the same infirmity as existed at O'Neill's trial; O'Neill's jury was never told what standard to use in the fourth-step deliberations, but rather was simply told that it must be "convinced" that death was the appropriate·penalty.

The trial court's rulings on these matters raise close and difficult questions. Even if the trial court's rulings were to be found erroneous, however, they would not affect the guilt phase of the trial. Rather, the proper remedy would be to reverse the death sentence. *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). In my view, this court's reliance on *Tenneson* to reverse the death sentence dispenses with any need to consider the correctness of the trial court's rulings on these matters. I accordingly do not join Parts IIC and IID of the court's opinion.

In joining Part IV of the court's opinion, I continue to disagree with the *Tenneson* formulation of the "proof beyond a reasonable doubt" standard with respect to the third phase of the deliberation proven, namely, that the · prosecution must prove beyond a reasonable doubt that mitigating factors do not outweigh proven aggravating factors. I disagree with such formulation because it permits the jury to return a death sentence predicated on a state of evidentiary equipoise. Irrespective of its propriety under federal constitutional standards, *see Walton v. Arizona*, — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (plurality opinion), I view such formulation as "irreconcilable with the heightened reliability and concomitant certainty required for a constitutionally valid death verdict" and thus violative of due process of law and the prohibition against cruel and unusual punishment under the Colorado Constitution. *People v. Tenneson*, 788 P.2d at 805 (Quinn, J., dissenting); *see also People v. Davis*, 794 P.2d 159, 218–19 (Colo.1990) (Quinn, J., dissenting). In the instant case, however, the trial court instructed the jury, correctly I believe, that "[t]he burden is on the prosecution to prove beyond a reasonable doubt that the aggravating factor or factors outweigh any and all of the mitigating factor or factors" and that the jurors must unanimously find beyond a reasonable doubt "that the aggravating factor or factors outweigh the mitigating factor or

factors" before proceeding to the final step of the deliberative process.

With the above qualifications, I specially concur in the judgment.

Justice VOLLACK concurring in part and dissenting in part:

I concur in the results of parts II and III of the court's opinion. I dissent, however, to part IV, the reversal of the penalty phase. I disagree with the majority's conclusion that the instructions given to O'Neill's jury did not ensure the heightened level of reliability and certainty required in capital sentencing. I would affirm the penalty phase and hold that the instructions given to O'Neill's jury had the required degree of reliability, based on *People v. Davis*, 794 P.2d 159 (Colo.1990).

The severity and finality of the death penalty are unique and require a heightened level of reliability and certainty in capital sentencing. *See Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860, 1869, 100 L.Ed.2d 384 (1988); *People v. Drake*, 748 P.2d 1237, 1254 (Colo.1988). In response to the need for greater reliability and certainty in death penalty cases, the legislature enacted section 16–11–103, 8A C.R.S. (1986), governing the penalty phase. At the time of O'Neill's offense, the statute provided a four-step process [1] for jury deliberations to determine whether the death penalty is appropriate. First, the jury must determine if at least one statutory aggravating factor exists beyond a reasonable doubt. § 16–11–103(2)(a)(I), –103(6), 8A C.R.S. (1986). Second, if the jury finds that at least one statutory aggravating factor exists, then it must determine whether any mitigating factors exist. § 16–11–103(2)(a)(II), –103(5), 8A C.R.S. (1986). Third, the jury must determine whether the mitigating factors outweigh the proven statutory aggravating factors. § 16–11–103(2)(a)(II). Fourth, if the jury finds that any mitigating factors do not outweigh the proven statutory aggravating factors, then the jury must decide whether the defendant should be sentenced

---

**1.** Section 16–11–103, 8A C.R.S. (1986), was amended in 1989 to eliminate the fourth step in the sentencing procedure. This amendment

was not in effect at the time of the murder in this case.

to death or life imprisonment. § 16–11–103(2)(a)(III), 8A C.R.S. (1986). The majority correctly notes that there is no statutory burden of persuasion attached to the third or fourth step. Maj. op. at 177.

Before addressing the instructions in question, the standard of review should be considered. The defendant did not object to instructions 6 and 15 on the ground that there was no statutory burden of persuasion attached to step four. The defendant's failure to object to an alleged error in the instructions, if there was error, should be reviewed under a standard of plain error. *Vigil v. People*, 196 Colo. 522, 524–25, 587 P.2d 1196, 1198 (1978); Crim.P. 52(b). Errors not raised at trial will require reversal only where they so undermine the fundamental fairness of the proceeding as to cast doubt on the reliability of the verdict. *Wilson v. People*, 743 P.2d 415, 419–20 (Colo.1987). Reliability in this context means the certainty that, despite the error, the jury would have found beyond a reasonable doubt that death was the appropriate penalty. If the unpreserved error is of constitutional dimension, reversal is required unless the court is convinced the error was harmless beyond a reasonable doubt. *People v. Rodgers*, 756 P.2d 980, 984 (Colo.1988). With this standard of review in mind, the instructions, in my opinion, were proper and, as given to the jury, did ensure reliability and certainty.

The majority concludes that a "beyond a reasonable doubt" instruction is necessary in step four—regardless of the instructions used in the other three deliberation steps— to ensure the reliability of the jury in returning a death sentence. I disagree. The two instructions in question are instructions 6 and 15. Instruction 6 outlines the four-step process set out in the statute. Instruction 6 provided:

### JURY INSTRUCTION 6

I will give you a general outline of the process to follow in your deliberations. The law allows the death penalty only if the prosecution, in addition to proving Murder in the First Degree, also proves that:

1. One or more of the specified aggravating factors exist beyond a reasonable doubt; and

2. Any aggravating factor or factors found to exist outweighs beyond a reasonable doubt any mitigating factor or factors found to exist;[2] and

3. Death is the appropriate penalty.

The first step in your deliberations is to decide whether the prosecution has proven the existence of at least one specified aggravating factor beyond a reasonable doubt. If one or more jurors finds that none of the specified aggravating factors has been proven beyond a reasonable doubt, then you must return a verdict imposing a sentence of life imprisonment. If and only if all jurors agree that one or more specified aggravating factors have been proven beyond a reasonable doubt, should you then proceed to the second step in your deliberations.

The second step in your deliberations is to decide whether any mitigating factor or factors exist.

The third step in your deliberations involves a weighing of the aggravating factor or factors against any and all mitigating factors. You may consider only those aggravating factors found to exist beyond a reasonable doubt. You may assign any weight you wish to each aggravating or mitigating factor. If one or more jurors finds the specified aggravating factor or factors do not outweigh the mitigating factor or factors, then you must return a verdict imposing a sentence of life imprisonment. If and only if the jury finds that one or more specified aggravating factors exist which outweigh the mitigating factors, should the jury then proceed to the fourth step.

The fourth step in your deliberations is to decide whether the defendant shall be sentenced to death or life imprisonment. This decision is solely in your discretion.

---

**2.** Although item 2 does not comply with the third step of the statute and *People v. Tenneson*, 788 P.2d 786 (Colo.1990), the benefit would in- ure to the defendant. *Tenneson* had not been decided at the time of this trial.

If one or more jurors finds that life imprisonment is the appropriate penalty, then you must return a verdict imposing a sentence of life imprisonment. On the other hand, if all members of the jury unanimously agree that death is the appropriate penalty, then the jury may return a verdict imposing a sentence of death.

I will now instruct you in greater detail regarding the steps to follow in your deliberations.

Instruction 15 elaborates on the fourth step and provides the jury with more specific guidance on determining whether death is the appropriate penalty. Instruction 15 provides:

## JURY INSTRUCTION 15

The fourth step in your deliberations is to determine the penalty to be imposed upon the defendant.

Before imposing a death sentence, you must unanimously be convinced that death is the appropriate penalty for the defendant. Each of you must make your own individual assessment of whether the defendant shall be sentenced to death or to life in prison. Your decision should not be mechanical or mathematical. Your decision should instead be a reasoned judgment as to whether, in your individual assessment, in light of the totality of the circumstances presented in this case and under these instructions of law, the defendant should be sentenced to life in prison or to death. If you are not all convinced that death is the appropriate penalty, the sentence must be life imprisonment.

Regardless of the findings you have made in steps one, two and three, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation.

No juror should ever feel compelled to reach a verdict that is contrary to that juror's conscientious view of what the verdict should be in the case, under the law contained in the Instructions of the Court, just for the sake of reaching a unanimous verdict.

Before a verdict of death can be imposed it must be unanimous. Thus, before you can return a verdict of death in this case, you must all unanimously agree on such a verdict. You may also unanimously reach a verdict of life imprisonment. If you cannot unanimously reach a verdict one way or the other, the foreman shall so notify the Court, and the result will be a sentence of life imprisonment imposed by the Court.

Your deliberations in this final step can lead to one of the three following results. You must select the appropriate result for the defendant.

1. If all jurors unanimously agree that the death penalty is the appropriate penalty, you may return a verdict imposing a sentence of death.

2. If all jurors unanimously agree that life in prison is the appropriate penalty, you may return a verdict imposing a sentence of life in prison.

3. If all jurors cannot agree on the appropriate penalty, the foreman of the jury shall so report to the Court, and the Court must impose a sentence of life imprisonment.

This instruction not only meets the statutory minimum, but exceeds it. This instruction requires a unanimous decision by the jury to impose the death penalty. The instruction makes it clear that any juror may decline to impose the death penalty for any reason, thus requiring the defendant to be sentenced to life imprisonment. This acts as a safety valve to prevent imposition of the death penalty except in those cases where the jury is unanimously convinced that death is the appropriate penalty. I believe that this instruction "communicate[d] to the jurors the degree of confidence they must have in the correctness of their ultimate conclusion" in returning a verdict of death. *People v. Tenneson*, 788 P.2d 786, 796 (Colo.1990).

The majority concludes that failure to include a "beyond a reasonable doubt" standard in the fourth step requires reversal, citing *Tenneson*. Subsequent to *Ten-*

*neson,* we decided *People v. Davis,* 794 P.2d 159 (Colo.1990). In *Davis,* the specific instructions concerning the fourth step were nearly identical to the instruction presented here. Instruction 7 in *Davis* provided:

> If in the third step of your deliberations you have made unanimous findings that the aggravating factor or factors found to exist outweigh the mitigating factors or that there are no mitigating factors, you must now decide whether the defendant should be sentenced to death or life imprisonment.
>
> Your decision in the fourth step of your deliberations should be based on the considerations you have previously made during the first three steps of your deliberations as outlined in these instructions. Before imposing a death sentence, you must unanimously be convinced that death is the appropriate penalty for the individual defendant being considered. This consideration involves a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or requires the imposition of the death penalty, in light of the totality of the circumstances present. If you are not all convinced that death is the appropriate penalty, the sentence must be life imprisonment.
>
> Regardless of the findings you have made in steps one, two and three, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation.
>
> Your deliberations in this final step can lead to one of the three following results:
>
> 1. If all jurors unanimously agree that the death penalty is the appropriate

penalty, you may return a verdict imposing a sentence of death.

> 2. If all jurors unanimously agree that life in prison is the appropriate penalty, you may return a verdict imposing a sentence of life in prison.
>
> 3. If all jurors cannot agree on the appropriate penalty, the foreperson of the jury shall so report to the court, and the court must impose a sentence of life imprisonment.

Although the defendant in *Davis* did not specifically argue that the trial court erred by instructing the jury as to the fourth step, he raised arguments concerning step three and the failure to include the appropriate burden of persuasion in places where the jury was given detailed instructions as to step three. *Davis,* 794 P.2d at 224 (Lohr, J., dissenting). The majority in *Davis* rejected this argument in adopting the totality of the circumstances and considering all of the penalty phase instructions together.[3] The majority in *O'Neill* adopts the argument rejected in *Davis* as to step three and applies it to step four in that the jury should be specifically instructed on the burden of persuasion in step four since it is separate and distinct from step three. Maj. op. at 178. (The *O'Neill* step three sets forth in Instruction 6 that aggravating factors should outweigh mitigating factors beyond a reasonable doubt.)

In light of our decision in *Davis* not to require the burden of persuasion to be specifically set forth in the detailed instruction, I am not persuaded that *Tenneson* is dispositive of this case. Much of this court's reasoning in *Tenneson* in deciding to apply the standard of "beyond a reasonable doubt" to the statute came about because of this court's concern "that under Colorado's statutory scheme the jury would proceed to the fourth step in the unlikely

**3.** *Davis* instruction no. 2 outlined an overview of the four-step process, and provided in relevant part:

> Your deliberations must take place in a certain order and within certain legal guidelines. Colorado law allows the death penalty only if the prosecution, in addition to proving Murder In The First Degree, also proves beyond a reasonable doubt that:

> 1. One or more of the specified aggravating factors exist beyond a reasonable doubt; and
>
> 2. No mitigating factor or factors outweigh the aggravating factor or factors found to exist beyond a reasonable doubt; and
>
> 3. Death is the appropriate punishment in this case.

*Davis* instruction no. 7 is the detailed instruction to step four.

event that the jury were convinced beyond a reasonable doubt that any mitigating factors and the proven statutory aggravating factors were exactly in balance." *Tenneson*, 788 P.2d at 796. The concerns present in *Tenneson* are not present in this case. The majority argues that the jury was free to chose any burden it desired in determining the appropriate sentence. I disagree. The jury was required to follow a four-step process as provided by the Colorado statute. Instruction 15 required the jury to apply its "reasoned judgment" to the "totality of the circumstances" and to consider all the instructions together before deciding whether death is appropriate. I believe that this instruction clearly conveyed to the jury the appropriate burden it was to apply and which was required by statute. The jury was not free to apply any burden it chose, as the majority argues. The instructions fully informed the jury of its responsibility before returning its verdict.

I dissent.

I am authorized to say that Chief Justice ROVIRA joins in this concurrence and dissent.